The **MAINE STATE HOUSING AUTHORITY**

v.

**DEPOSITORS TRUST COMPANY.**

Supreme Judicial Court of Maine.

June 23, 1971.

McLean, Southard, Hunt & Lipman, by Sumner H. Lipman, Augusta, Hawkins, Delafield & Wood, by Gerard Fernandez, Jr., Janice C. Griffith, New York City, for plaintiff.

Locke, Campbell & Chapman, by Frank G. Chapman, Augusta, for defendant.

Before DUFRESNE, C. J., WEBBER, WEATHERBEE, POMEROY, WERNICK, and ARCHIBALD, JJ.

WEATHERBEE, Justice.

On Report.

In 1949 the Maine Legislature enacted the Maine Housing Authorities Act the purposes of which may generally be stated to be to assist in making available safe and sanitary dwelling accommodations for persons of low income and to benefit the general social and economic condition of the entire community by removing unsafe, unsanitary and overcrowded dwelling units and by eliminating lighted municipal areas. P.L.1949, Chap. 441. The Act eventually became 30 M.R.S.A. §§ 4551 to 4766 inclusive and has undergone considerable amendment in later legislative sessions.

On December 21, 1970 the Authority, in an effort to effectuate its corporate purposes, entered into a Note Purchase Agreement with the Defendant Bank under which the Bank contracted to purchase Bond Anticipation Notes of the Plaintiff in an aggregate amount of $50,000. The Agreement contains a warranty by the Plaintiff of the validity of its existence as a public body corporate and politic, its authority to enter into the Agreement and to purchase mortgage loans for a valid public purpose and that its notes shall be valid, binding and enforceable obligations of the Authority and not obligations of the State.

Upon being advised by its counsel that serious doubts exist as to the constitutionality of the Act which created the Plaintiff Authority, the Defendant declined to fulfill its commitment. The Plaintiff then brought this action for a Declaratory Judgment as to its rights under the Agreement, as provided by 14 M.R.S.A. §§ 5951 to 5963, and the Defendant answered raising affirmative defenses based on constitutional questions and joined in the prayer for a Declaratory Judgment.

The parties submitted the matter to the Superior Court on an agreed statement of facts and it has been reported to us for answer to four questions of law which present the issues raised by Defendant's affirmative defenses. The evident purpose of this action is to test for the first time the constitutionality of the Act.

The four questions presented to us ask us whether in those four specific respects the Act offends certain constitutional mandates. We find that it does not.

*Question 1.*

Does the action taken by the Maine State Housing Authority ("Authority") created and acting pursuant to the "Maine Housing Authorities Act" being Title 30, Chapter 239, Subchapter II, Sections 4551 to 4766, inclusive of the Maine Revised Statutes Annotated, as amended, ("Act") for the purpose of exercising its corporate purposes including the purchase of first mortgage loans or evidences thereof for persons or families deemed by the Authority to require such assistance on account of low personal or family income taking into consideration the criteria set forth in the Act constitute a valid and constitutional public purpose (Article IV, Part Third, Section I and Article I, Section 21 of the Constitution of the State of Maine; and Amendment XIV, Constitution of the United States) for which money raised by the issuance and sale of tax-exempt notes and bonds of the Authority may be expended?

The constitutional provisions against which the question requires us to measure the purposes of the Act follow:

"The Legislature * * * with the exceptions hereinafter stated, shall have full power to make and establish all reasonable laws and regulations for the defense and benefit of the people of this State, not repugnant to this Constitution, nor to that of the United States." Arti-

cle IV, Part Third, Section 1, Constitution of Maine.

"Private property shall not be taken for public uses without just compensation; nor unless the public exigencies require it." Article I, Section 21, Constitution of Maine.

"No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." Amendment XIV, Constitution of the United States.

In Crommett et al. v. Portland, 150 Me. 217, 107 A.2d 841 (1954) we examined the basic principles which distinguish public use from private use in the field of governmental activity. There we concluded that

"* * * Whether the public exigency requires the taking of private property for public uses is a legislative question, the determination of which by the legislature is final and conclusive. * * * Whether the use for which such taking is authorized is a public use is a judicial question for the determination of the court."

■ While section 4751 of the Act recites that "Bonds of an authority are declared to be issued for an essential public

and governmental purpose * * *" we must remember that, as we said in *Crommett* "Whether a given use of public moneys is public in nature is a matter for determination by the courts." However, while a legislature's opinion that its proposed use would be public is not conclusive upon the Court, its findings are entitled to great respect since they relate to public conditions which, by necessity and duty, the legislature must know. Block v. Hirsh, 256 U.S. 135, 154, 41 S.Ct. 458, 65 L.Ed. 865, 16 A.L.R. 165 (1920).

We approach the duty before us mindful of the existence of a strong presumption of the constitutionality of a statute.

"Unless it has clearly exceeded its constitutional powers in so doing, its action must be sustained. All rational doubts as to the constitutionality of statutes must be resolved in favor of the constitutionality thereof. Although it is the duty of the court to declare acts which transcend the powers of the legislature void, this judicial duty is one of gravity and delicacy and it is only when there are no rational doubts which may be resolved in favor of the constitutionality of the statute that the inherent power of the court to declare statutes unconstitutional should be exercised." State of Maine v. F. H. Vahlsing, Inc., 147 Me. 417, 88 A.2d 144 (1952).

In enacting the statute, the Legislature determined (sec. 4553)[1] that there exists a

---

1. "It is declared that there exists in urban and rural areas in the State insanitary, unsafe and overcrowded dwelling accommodations; that in such urban and rural areas within the State there is a shortage of safe or sanitary dwelling accommodations available at rents or prices which persons, particularly veterans, of low income can afford and that such shortage forces such persons to occupy insanitary, unsafe and overcrowded dwelling accommodations; that such conditions, and the existence of blighted areas, impair economic values and tax revenues; that these conditions cause an increase in and spread of disease and crime and constitute a menace to the health, safety, morals and welfare of the residents of the State; that these conditions necessitate excessive and disproportionate expenditures of public funds for crime prevention and punishment, public health and safety, fire and accident protection and other public services and facilities; that these areas in the State cannot be cleared, nor can the shortage of safe and sanitary dwellings for persons of low income be relieved through the operation of private enterprise, and that the construction of housing projects for persons of low income would therefore not be competitive with private enterprise; that the construction of such projects would make housing available for returning veterans

scarcity of safe and sanitary dwelling accommodations priced for sale or rental within the range which persons of low income can afford. The Legislature found that many blighted areas exist where unsafe, unsanitary and overcrowded dwelling accommodations constitute a menace to the health, safety, morals and welfare of all the residents of the State, impairing both human and economic values. The Legislature further found that these deplorable conditions cannot be relieved "through the operation of private enterprise" and that the clearance of such blighted areas, the construction of housing projects for persons of low income and aid in the repair of deteriorating dwellings would "not be competitive with private enterprise" and will benefit the public as a whole. The Legislature has found a public exigency requires the action which it has empowered the authority to take and this determination is final. Paine v. Savage, 126 Me. 121, 136 A. 664 (1927).

The Act empowers the Authority to study the State's housing needs and to make its studies available to other public agencies, to acquire real property by eminent domain or otherwise, to construct and operate housing projects, renting, leasing and selling their units. In order to carry out the purposes of providing housing for people of low income [2] it is authorized to accept federal funds and other assistance, to issue revenue bonds or notes and to purchase and sell first mortgages and notes.

It is agreed that Defendant had contracted to purchase certain Bond Anticipation Notes from Plaintiff and that the Plaintiff proposed to use the proceeds of the sale of the notes to enable it to meet an agreement to purchase from the Livermore Trust Company first mortgages on

of low income who are unable to provide themselves with decent housing on the basis of the benefits heretofore made available to them through certain government guarantees of loans to veterans for the purchase of residential property; that the clearance, replanning and preparation for rebuilding of these areas, the prevention or the reduction of blight and its causes, and the providing of safe and sanitary dwelling accommodations for persons of low income are public uses and purposes for which public money may be spent and private property acquired and are governmental functions of state concern; that residential construction activity is closely correlated with general economic activity and that the undertakings authorized by this subchapter to aid the production of better housing and more desirable neighborhood and community development at lower costs will make possible a more stable and larger volume of residential construction which will assist materially in achieving and maintaining full employment; and that it is in the public interest that advance preparations for such projects and activities and for the purchasing and guaranteeing of mortgages be made now, and that the necessity in the public interest for the provisions hereinafter enacted is declared as a matter of legislative determination.

It is further declared that there are serious problems relating to the occupants of existing substandard housing in this State in both urban and rural areas. Much of the existing housing in this State is in immediate need of major repair or replacement; and this subchapter is intended to encourage all existing local, state and federal agencies, public and private agencies, to recognize the needs for rehabilitation and new housing and to adopt such action and practices as to promote a concerted effort to upgrade housing conditions and standards within this State. It is further declared that this subchapter is intended to relieve those conditions which now exist and it is the policy of the State to assist in planning, coordinating and carrying out all existing programs that will encourage further participation by private investment, private enterprise and individual effort.

* * *"

2. 30 M.R.S.A. § 4552(11). "Persons of low income. 'Persons of low income' shall mean persons or families, elderly or otherwise, who lack the amount of income which is necessary, as determined by the authority, to enable them, without financial assistance, to live in decent, safe and sanitary dwellings, without overcrowding."

dwelling units of persons of low income in order to carry out the purposes of the Act.

The Act purports to empower Plaintiff to issue its bonds in order to carry out the purposes of the Act and to sell its notes in anticipation of the bond issue. Defendant's agreement to purchase the Plaintiff's notes is valid and enforceable only if Plaintiff was, in carrying out its functions under the Act, serving a public, rather than a private purpose. This determination must be made by the Court. Allen v. Jay, 60 Me. 124, 139 (1872).

In determining whether a given use is public in nature we must consider existing conditions, as we did in *Crommett*.

"* * * [W]hat could not be deemed a public use a century ago, may, because of changed economic and industrial conditions, be such today. Laws which were entirely adequate to secure public welfare then may be inadequate to accomplish the same results now." Laughlin v. City of Portland, 111 Me. 486, 90 A. 318 (1914).

"Admittedly the line of demarcation between a public and a private use is not always easy to draw. Whether a use is public or private is a question of law for the court. This question must be determined by the application of established legal principles to the then existing facts." State of Maine v. F. H. Vahlsing, Inc., supra.

The purpose of the Act is to eliminate areas of crowded, unsafe and unsanitary housing and to make available, either through public construction or through financing of private construction and improvement, adequate housing for people of low income, victims of disaster and defense workers.

This Court and its Justices have distinguished public from private uses on other occasions. Brewer Brick Company v. Brewer, 62 Me. 62 (1873); Opinion of the Justices, 152 Me. 440, 131 A.2d 904 (1957); Laughlin v. City of Portland, supra. In Paine v. Savage, supra, the Court said, in finding grants of rights of way when necessary for lumbering purposes not to be public uses:

"A public use must be for the general public, or some portion of it, who may have occasion to use it, not a use by or for particular individuals. It is not necessary that all of the public shall have occasion to use. It is necessary that every one, if he has occasion, shall have the right to use."

In *Crommett* this Court found that the clearance and redevelopment of blighted and slum areas by a public body corporate and politic was a public use.

*Crommett* was a bill in equity to test the constitutionality of the Slum Clearance and Redevelopment Authority Law, which was P. & S.L., 1951, Chap. 217. There, we found that the first and main purpose of that Act was to clear away blighted areas and slums and to prevent their recurrence. We recognized there that after slum clearance was completed a large part of the area would return to private use and that the Authority would doubtless be to some extent in the business of selling and leasing real estate for private uses. We found there that redevelopment of the area was an essential—but secondary—purpose of that Act and that a public use, in a limited sense, would continue as the Authority's sale or lease of the cleared property was to be subject to such conditions and restrictions as the Authority deemed necessary to prevent recurrence of the harmful conditions. We found in *Crommett* that no public use is involved in only "correcting a condition from which an area 'substantially impairs or arrests the sound growth of the municipality, or constitutes an economic or social liability'".

"The public use, as we have said, is found in the course of conditions harmful to the public health, safety, morals or welfare."

Here, the declared purpose of the Legislature goes beyond that of the clearance of

blighted areas and redevelopment which the Court found to be public uses in *Crommett*. The present Act contemplates removal of blighted areas, construction and operation of housing units for persons of low income and assisting in the financing of private repair and replacement of substandard dwellings. The Legislature has delegated to the Authority the police power of the State to meet conditions which the Legislature has found to be a threat to the general welfare.

█ Our task is to determine whether the carrying out of the purpose declared by the Legislature, by the means chosen by the Legislature, will confer a general benefit upon the public at large.

The relationship between overcrowded, unsanitary and unsafe dwelling accommodations and disease and crime is abundantly clear, as the Legislature has found it to be. The elimination of such overcrowded, unsanitary and unsafe dwelling accommodations and the assisting in making available decent, safe and sanitary housing for people of low income who would otherwise find it unavailable is a proper exercise of the police power and has a clear relationship to the health, safety, morals and welfare of the people as a whole and serves a public purpose. Vermont Home Mortgage Credit Agency v. Montpelier National Bank (Vt.), 262 A.2d 445 (1970); Massachusetts Housing Finance Agency v. New England Merchants National Bank of Boston, 356 Mass. 202, 249 N.E.2d 599 (1969); In re Advisory Opinion, 380 Mich. 554, 158 N.W.2d 416 (1968); New York City Housing Authority v. Muller, 270 N.Y. 333, 1 N.E.2d 153 (1936).

We find that the Legislature's delegation of power to the Authority to accomplish this purpose is contained within sufficient and reasonable standards to permit the carrying out of the purpose.

The powers of the Authority are clearly stated in Section 4651. The policy of the State to make the proposed dwelling accommodations available at as low charges as possible is succinctly announced.[3] The standard governing the choice of persons to whom dwelling accommodations will be rented or leased[4] and those persons to whom mortgage credit will be extended are sufficiently limited to confine the operations of the Authority to the purposes defined by the Legislature.[5]

---

3. 30 M.R.S.A. § 4652. "Operation of housing not for profit.

It is declared to be the policy of this State that each authority shall manage and operate its housing projects in an efficient manner so as to enable it to fix the rentals or payments for dwelling accommodations at low rates consistent with its providing decent, safe and sanitary dwelling accommodations for persons of low income, and that no authority shall construct or operate any housing project for profit, or as a source of revenue to the municipality or State. * * * "

4. 30 M.R.S.A. §§ 4653, 4654.

5. 30 M.R.S.A. § 4760. "Bonds; use of proceeds.

The state authority may authorize the issuance of revenue bonds of the authority in the manner and as provided in section 4751 for any of its authorized purposes including the purchase of first mortgage loans or evidences thereof made not more than 6 months prior to such purchase, for residential housing in the State of Maine from the financial institutions and other agencies specified in section 4756. Such loans may include but shall not be limited to loans which are insured, guaranteed or assisted by the United States or an instrumentality thereof or for which there is a commitment by the United States or an instrumentality thereof to insure, guaranty or assist such loan and shall be for persons and families deemed by the state authority to require such assistance as is made available by this subchapter on account of low personal or family income, taking into consideration:

1. The amount of the total income of such persons and families available for housing needs;

2. The size of the family;

3. The eligibility of such persons and families for federal housing assistance of

*Question 2.*

■ Does the sale and issuance of bonds or notes of the Maine State Housing Authority for any of its corporate purposes including the purchase and sale of residential first mortgage loans pursuant to the Act constitute a loan of the credit of the State of Maine ("State") or the creation of any debt or debts, liability or liabilities on behalf of the State, in violation of the provisions of Article IX, Section 14 of the Constitution of the State, notwithstanding the statement in Section 4751 of the Act that the bonds and other obligations of an authority shall not constitute an indebtedness of the State within the meaning of any constitutional or statutory debt limitation or restriction?

We hold that the sale and issuance of such bonds or notes will not constitute a debt of the State within the meaning of any constitutional or statutory debt limitation or restriction.

We are concerned with the prohibition of Article IX, Section 14 of the Constitution of the State of Maine reading:

"The credit of the State shall not be directly or indirectly loaned in any case, except as provided in Sections 14–A and 14–B. The Legislature shall not create any debt or debts, liability or liabilities, on behalf of the State, which shall singly, or in the aggregate, with previous debts and liabilities hereafter incurred at any one time, exceed two million dollars, except to suppress insurrection, to repel invasion, or for the purposes of war, and except for temporary loans to be paid out of money raised by taxation during the fiscal year in which they are made; and excepting also that whenever two-thirds of both Houses shall deem it necessary, by proper enactment ratified by a majority of the electors voting thereon at a general or special election, the Legislature may authorize the issuance of bonds on behalf of the State at such times and in such amounts and for such purposes as approved by such action; but this shall not be construed to refer to any money that has been, or may be deposited with this State by the Government of the United States, or to any fund which the State shall hold in trust for any Indian tribe. * * *"

The exceptions found in sections 14–A, 14–B and 14–C are not dispositive of our problem.

The Act itself, § 4751, specifically declares that

" * * * The bonds and other obligations of an authority, and such bonds and obligations shall so state on their face, shall not be a debt of the municipality, the State or any political subdivision thereof and neither the municipality nor the State or any political subdivision thereof shall be liable thereon, nor in any event shall such bonds or obligations be payable out of any funds or properties other than those of said authority. The bonds shall not constitute an indebtedness within the meaning of any constitutional or statutory debt limitation or restriction. Bonds of an authority are declared to be issued for an essential public and governmental purpose and to be public instrumentalities and, together with interest thereon

any type predicated upon a low income basis; and

4. The ability of such persons and families to compete successfully in the normal housing market and to pay the amounts at which private enterprise is providing decent, safe and sanitary housing, and deemed by the state authority therefore to be eligible to occupy residential housing constructed and financed, wholly or in part, with insured construction loans or insured mortgages, or with other public or private assistance.

The state authority may not purchase a first mortgage loan or evidence of such loan if the mortgagor's annual net income, together with the income of family members living in the mortgaged residential housing, at the time the original loan was made, exceeded 100% of the equivalent income rates for public housing rental eligibility under section 4653."

and income therefrom, shall be exempt from taxes."

We find no provision of the Act which contradicts the clear language of section 4751—reserving our specific consideration of section 4761 for discussion under the next issue.

■ The principle that the Legislature may establish public authorities which exist as distinct and separate corporate bodies the obligations of which are not debts of the state or municipalities is fully accepted in this state. Kennebec Water District v. City of Waterville, 96 Me. 234, 52 A. 774 (1902).

In 1867 the Justices of this Court studied the history of the constitution's limitation on the Legislature's power to create indebtedness on the part of the state which was added to the constitution in 1847. The Justices said:

"The general design was to provide a perpetual check against rashness or improvidence. 'The credit of the State shall not be directly or indirectly loaned in any case.' This indicates the great purpose of the amendment. But as there may be occasions for indebtedness for State purpose, authority is given to create a debt to the amount of three hundred thousand dollars. Indebtedness on the part of the State is limited to this amount. The object of the amendment cannot be misunderstood. Its binding force cannot be denied. It is the calm and deliberate expression of the popular will, embodied in the solemn form of a constitutional restriction upon legislative action." Opinion of the Justices, 53 Me. 587.

We find in the Act none of the indirect obligations under which the State would in fact be required to use tax money to meet the obligations of the Authority—in sharp contrast to the undertaking of the State contained in a proposed Act creating the Maine State Office Building Authority which was found in 1951 to offend this constitutional prohibition. Opinion of the Justices, 146 Me. 183, 79 A.2d 753. There the Justices found that the provision of that Act that empowered that Authority to issue its notes and bonds which were to be retired entirely out of the "rental" payments made by the State for its occupancy of the building would be, in the constitutional sense, a liability created by the Legislature on the part of the State.

A similar, municipal, obligation was found to exist in an Act creating the Maine School Building Authority the revenue bonds of which were to be paid solely from rental payments to be received from the various towns which were to lease the proposed buildings. Opinion of the Justices, 146 Me. 295, 80 A.2d 869 (1951).

*Question 3.*

Does Section 4761 of the Act providing for the establishment and maintenance of the special fund called the "Housing Reserve Fund" constitute a loan of the credit of the State of Maine ("State") or the creation of any debt or debts, liability or liabilities on behalf of the State, in violation of the provisions of Article IX, Section 14 of the Constitution?

We are asked to determine whether the Legislature's enactment of the provision that the Legislature shall annually appropriate and pay to the Authority "such sum, if any, as shall be certified by the director of the state authority to the Governor as necessary to restore [the Housing Reserve Fund] to an amount equal to the required minimum reserve" constitutes a loan of the credit of the State or creates an indebtedness on the part of the State. We hold that it does neither.

■ One legislature cannot impose a legal obligation to appropriate money upon succeeding legislatures. Opinion of the Justices, 146 Me. 183, 189, 79 A.2d 753, supra. An attempt to do so would be invalid and we should avoid giving the section a construction which would render it unconstitutional when—as here—an alternative

construction is reasonably presented. Hamilton v. Portland Pier Site District, 120 Me. 15, 112 A. 836 (1921). The Legislature is presumed to have in mind the decisions of the Court. State v. Crommett, 151 Me. 188, 194, 116 A.2d 614, 617 (1955); 50 Am.Jur., Statutes, § 442; 82 C.J.S. Statutes § 316. We consider equally reasonable the presumption that the Legislature had in mind the Opinions of the Justices presented earlier to the Legislature. In our opinion, the Legislature, knowing of its inability to commit succeeding Legislatures to the appropriation of moneys, did not intend the language under consideration to attempt any such futile purpose. Furthermore, a construction of the ambiguous language of section 4761 which would give "shall" the effect of a determination to obligate the State would be in acute conflict with the positive declaration of section 4751 that the bonds and other obligations of the Authority shall not be a debt of the State and that the Authority's bonds shall so state on their face.

This precise issue has been before the courts of other jurisdictions. The Massachusetts Legislature created a Housing Finance Agency the bonds and notes of which it declared not to constitute a debt of the Commonwealth but to be payable solely from proceeds of mortgage loans, from reserve funds created therefor by the Authority and from mortgage insurance contracts. The Massachusetts Act also provided for the establishment of a Capital Reserve Fund and in language almost identical to ours, that to assure maintenance of this fund "there shall be annually appropriated and paid to * * * MHFA * * * such sum, if any, as shall be certified by the chairman of * * * MHFA to the governor as necessary to restore the Capital Reserve Fund to" the required balance.

The Massachusetts Court construed the latter section, when read with former, as only an expression of future intention or expectation and not as imposing any binding obligation upon future legislatures to make an appropriation of funds. Massachusetts Housing Finance Agency v. New England Merchants National Bank of Boston, supra.

The Supreme Court of Michigan considered the constitutionality of an Act creating a State Housing Authority in an answer to a request from the Governor for an advisory opinion as to its constitutionality. In re Advisory Opinion, 380 Mich. 554, 158 N.W.2d 416 (1968), the Justices advised the Governor that while the Act provides that the Authority shall annually certify to the Governor the amount necessary to restore the capital reserve fund to a required level and that such an amount will be appropriated for that purpose, the appropriations contemplated were permissive only and the State was not thus assuming an obligation to make such appropriations.

A similar provision in the statute creating the North Carolina Housing Corporation was held not to constitute a pledge of the faith and credit of the State or to create debts on behalf of the State. Martin v. North Carolina Housing Corporation, 277 N.C. 29, 175 S.E.2d 665 (1970).

■ The reasoning of these authorities appears to us to be indubitably correct and we arrive at the same conclusion as to our own statute. We consider that the Legislature, having positively stated its intention not to obligate the state, and aware of its inability to bind future legislatures even if it wished to do so, intended only to express to its successors an expectation and aspiration that the project might be found worthy of financial assistance, if later needed.

*Question 4.*

Does Section 4761 of the Act providing for the establishment and maintenance of the "Housing Reserve Fund" bind or obligate a succeeding Legislature to appropriate and pay to the Authority in any future year the amount duly certified in such year as necessary to restore the "Housing Reserve Fund" to the required "minimum reserve" in violation of the Constitution of

the State of Maine and if not in violation of the Constitution may a succeeding Legislature validly and constitutionally appropriate and pay such amount to the Authority for such purpose?

As we have just concluded in our consideration of Question 3, the language of section 4761 is permissive and hopeful only and we do not construe it as intending to attempt to obligate succeeding Legislatures to appropriate such sums as may be necessary to restore the "Housing Reserve Fund" to the required minimum reserve and, therefore, it is not in this respect in violation of our Constitution.

■ As the purposes for which such an appropriation by succeeding Legislatures would be used are proper public purposes there is no constitutional bar, based upon the issues we have herein considered, to future Legislatures making such appropriations if they elect to do so.

Plaintiff is adjudged entitled to specific performance of its contract with defendant. So ordered.