COMMON CAUSE et al.*

v.

STATE of Maine et al.**

Supreme Judicial Court of Maine.

Argued Sept. 21, 1982.

Decided Jan. 7, 1983.

---

\* Plaintiffs are fourteen individuals, who are residents, voters and taxpayers of the State of Maine, and Common Cause, a non-profit membership corporation organized under the laws of the District of Columbia and authorized to conduct its affairs in Maine. It has members who are residents, voters and taxpayers of Maine; it is itself a taxpayer of Maine.

\*\* Defendants are the State of Maine, Governor Brennan, Transportation Commissioner George N. Campbell, State Treasurer Samuel D. Shapiro, the City of Portland, and Bath Iron Works Corporation.

2

Joseph Steinberger (orally), Augusta, for plaintiffs.

Orlando E. Delogu (orally), University of Maine School of Law, pro se.

James E. Tierney, Atty. Gen., Rufus E. Brown, Deputy Atty. Gen. (orally), Paul Stern, Robert Frank, Asst. Attys. Gen., Augusta for State of Maine, David Lourie, Corp. Counsel, City of Portland (orally), Bernstein, Shur, Sawyer & Nelson, John M.R. Paterson (orally), Leonard M. Nelson, Linda A. Monica, Andrew J. Bernstein, Portland, for Bath Iron Works; Wilkie, Farr and Gallagher, New York City, of counsel.

Before GODFREY, NICHOLS, ROBERTS, CARTER, VIOLETTE and WATHEN, JJ., and DUFRESNE, A.R.J.

GODFREY, Justice.

Early in 1981, Bath Iron Works Corporation (BIW), a subsidiary of Congoleum Corporation, was negotiating with officials of the city of Boston to lease parts of the Boston Navy Yard. BIW wanted to expand its business by undertaking the repair and overhaul of large ocean-going vessels, work that could not be carried out in the confines of BIW's location on the river in Bath, Maine. The facilities at Boston, which were complete and immediately available, included a permanent dry dock capable of handling the largest ships, extensive pier, warehouse and manufacturing facilities, and living quarters for seamen from ships under repair.

Officials of the city of Portland learned of the negotiations and sought out BIW to inquire whether it would entertain a competing proposal from Portland. On obtaining a favorable response, the city solicited and obtained the state's participation in

making a proposal. There followed a series of meetings of state, city and BIW officials, out of which evolved a joint proposal from the state and city to BIW under which the state and city would create in Portland harbor a comprehensive facility for ship repairs to be operated by BIW. Portland and the state had been engaged for several years in efforts to restore the vitality of the port, and the officials concerned regarded the creation of a major ship repair and overhaul facility as consistent with the already identified goals of improving the harbor, attracting more marine commerce, and, in general, redeveloping the economic potential of the Portland waterfront.

In July, 1981, officers of BIW, the state and the city executed a "Memorandum of Intent" outlining their tentative tripartite agreement for development of a dry dock facility at the Maine State Pier in Portland. On August 1, 1981, they entered into a further set of related agreements: namely, a "Comprehensive Commitment," a dry dock lease, and a pier lease—all contingent on approval by the Legislature and Maine electorate of the state's commitment to the project, by the city council and electorate of Portland for the participation of the city, and by the boards of directors of BIW and Congoleum Corporation.

In broad outline, the Memorandum of Intent called for the following acts to be done: (1) the state was to obtain title to a large floating dry dock meeting certain specifications. It was expected that the acquisition would be effected by a gratuitous transfer from the federal government to the state of Maine of such a dry dock, an "AFDB–3", having an adjusted capacity of 81,000 tons.[1] (2) The state was to transfer its title in the Maine State Pier to the city of Portland for $4.6 million dollars. (3) The state and BIW were to share the cost of acquiring and rehabilitating the floating dry dock, the first $9 million dollars of that cost to be borne equally by BIW and the

state, the next $15.1 million to be borne by the state alone, using for this purpose the $4.6 million paid by the city for the pier. All costs of rehabilitating the dry dock in excess of $24.1 million dollars were to be borne by BIW. (4) The state was to provide an additional $.5 million dollars to defray miscellaneous costs in initial planning, acquisition of land and issuance of bonds. (5) The state of Maine was to retain title to the dry dock, which was to be leased to BIW for 20 years, with an option in BIW to purchase it under certain conditions. No dollar amount of rent for the dock was provided for. (6) BIW was to install equipment and operate the dry dock at its own expense in accordance with the agreement, subject to United States Navy regulations. (7) The city was to acquire certain land adjacent to the pier property and lease it, with the pier itself, to BIW for stated amounts of annual rent, funding the improvement of the pier and adjacent submerged lands and shoreland with the $10.4 million remaining after purchase of the pier. (8) The city was to improve and lease to BIW the city hospital to provide suitable dormitory quarters for the berthing of seamen, the rental to be determined according to actual use by crew members. (9) The state's costs under the project, aside from $.5 million for start-up costs and the $4.6 million received from the city for transfer of the pier, were to be met by the issuance of general obligation bonds of the state; the city's costs were to be met by issuance of general obligation bonds of the city of Portland.

The Governor called a special session of the Legislature for August 3, 1981, to consider legislation authorizing the issuance of bonds to implement the state's participation. Before the special session, the state provided each member of the Legislature with explanatory materials, describing the project and appending a copy of the Memorandum of Intent.

---

1. The floating dry dock, originally in the service of the United States Navy, was to be donated to the state by the General Services Adminis- tration subject to certain conditions for its use. It was not available for direct purchase by BIW.

The Governor proposed that, instead of enacting a wholly new and separate bond authorization, the Legislature amend an already existing authorization for an economic development bond issue enacted by 1981 Private and Special Laws, chapter 65, which had been scheduled for referendum in November. Chapter 65 authorized a referendum on bond issues for a central feed grain terminal, central potato packing facilities, cargo piers and airports in the total amount of $28 million dollars, $10 million of which was intended to be used to construct a cargo pier in Portland. The proposed amendment to carry out the Portland project provided for adding $5 million dollars in bonding authority, for a total of $33 million, and included among the authorized economic development projects "port facilities", defined by the amendment to include, among other things, dry docks and ship repair facilities. The proposal was discussed in public hearings before the transportation committee of the Legislature and reported favorably by that committee. After debate in both houses, the amendment was passed as 1981 Private and Special Laws, chapter 75, and the question of the issuance of $33 million dollars' worth of economic development bonds was put to referendum pursuant to article IX, section 14 of the Maine Constitution.

After the Legislature enacted authorization for the bond issue, the project and the desirability of issuing general obligation bonds to aid in carrying it out were the subject of debate in the newspapers and on television and radio, including a televised debate by the counsel for Common Cause and the president of BIW. On November 3, 1981, the bond issues were approved by the voters of the state and city.

On January 18, 1982, the parties entered into agreements in final form: a dry dock operating agreement between the state and BIW; a sale and purchase agreement between the city and the state concerning the Maine State Pier; a lease of the Maine State Pier from the city to BIW; and a "Comprehensive Commitment." The financing provisions of the January, 1982, agreements resemble closely those described in the July, 1981, Memorandum of Intent and the August, 1981, Comprehensive Commitment.[2] In addition, BIW agrees to invest working capital, to buy all necessary capital equipment to operate the dock, to waive any state-jobs credit it might become entitled to on its state income tax arising from its investment in completing the dry dock, and to pay the operating costs of the dry dock until the agreement terminates, including utilities, taxes, maintenance, repair, and insurance.

BIW has the exclusive right to use the dry dock for up to forty years, without rent and without obligation to repay any of the money spent by the state for renovation of the dock. Although it has no general option to purchase, BIW has a right of first refusal for a three-year period after the forty-year term, whereby it may acquire the dry dock for $1,667,000 if the state decides to sell the dry dock during that period. BIW has the right to terminate the agreement at the end of certain years, beginning as early as 1986, upon at least thirty days' notice to the state. If BIW so terminates, it must pay maintenance costs for the six months following the termination. The state may terminate the agreement without cause at stated times beginning as early as 2006, upon six months' notice to BIW. If the state so terminates, BIW has a 90-day option to purchase the dry dock for $1,667,000. The agreement provides for sharing of proceeds of transfer of the dock by the state in the event of expiration or termination of the agreement under certain conditions. The agreement

2. The principal change is that instead of a twenty-year lease with option in BIW to purchase, as proposed in the July, 1981 Memorandum of Intent, the dry dock operating agreement of January, 1982 provides for a 40-year term without option to purchase but with certain rights of first refusal in BIW. Also, the January agreement is not denominated a "lease." It contains no provision for rent, and the rights of the state on default by BIW are different from the customary rights of a landlord.

provides for audit of BIW's expenditures in renovating the dock and contains remedies for the state and city in the event of default by BIW in its performance under the dock agreement or the pier lease.

The dry dock has an estimated current salvage value of about $875,000. Yearly maintenance costs are projected roughly at $720,000. It has a useful life of between forty and fifty years, and perhaps longer if well-maintained. At the end of forty years, the dry dock, if well-maintained and modernized, will be worth between five percent and thirty percent of its value after renovation in accordance with the terms of the agreements.

On April 19, 1982, the plaintiffs began this action in Superior Court, Kennebec County, for declaratory and injunctive relief. In a three-count complaint they alleged (1) that the use of public funds in the manner contemplated by the agreements would amount to taxation for private purposes in violation of the Maine and United States Constitutions; (2) that the incurring of debt by the state for the benefit of BIW, as provided for in the agreements, is a lending of the state's credit prohibited by article IX, section 14 of the Maine Constitution; and (3) that the issuance of bonds for the purpose set forth in the agreements was not authorized by the electorate of Maine as required by article IX, section 14 of the Maine Constitution.

Plaintiffs asked the Superior Court to issue a declaratory judgment holding the terms of the agreements to be in violation of the state and federal constitutions and hence without effect; to enjoin the state and the defendant officials from transferring funds to BIW under the terms of the agreements, and from borrowing funds on the credit of the state for that purpose; and to order such further relief as would "do substantial justice and protect and preserve the rights and interests of both plain-

tiffs and defendants and of the people of the State of Maine."

After a trial lasting three and one-half days, the Superior Court gave judgment for the defendants, declaring that the terms of the agreements were not in violation of the Maine Constitution and denying injunctive relief. On appeal by the plaintiffs, we affirm the judgment, though on grounds different from those given by the Superior Court.

## I. STANDING

A. *Plaintiffs' Standing to Raise Equal-Protection Claims.*

The plaintiffs contend that the BIW project violates the equal-protection clauses of the state and federal constitutions because no other Maine firms receive the benefits conferred on BIW by the agreements and the resulting discrimination is without rational basis. In effect, the plaintiffs seek to assert some kind of constitutional right of Maine firms not parties to this suit. The defendants argue that the plaintiffs may not challenge the project on equal-protection grounds under the fourteenth amendment to the United States Constitution or article I, section 6–A of the Maine Constitution.[3]

The general rule is that a litigant may not assert the constitutional rights of third parties. *Singleton v. Wulff,* 428 U.S. 106, 113–14, 96 S.Ct. 2868, 2873–2874, 49 L.Ed.2d 826 (1976) (plurality op.); *United States v. Raines,* 362 U.S. 17, 21, 80 S.Ct. 519, 522, 4 L.Ed.2d 524 (1960); *Friedman v. Harold,* 638 F.2d 262, 264–68 (1st Cir.1981); *Brann v. State,* 424 A.2d 699, 702 (Me.1981). That longstanding rule is based on three considerations: first, if the holders of those rights either did not wish to assert them or could enjoy them regardless of the success of the in-court litigant, the court would adjudicate the rights unnecessarily. *Single-*

---

3. Me. Const. art. I, § 6–A provides as follows: No person shall be deprived of life, liberty or property without due process of law, nor be denied the equal protection of the laws, nor be denied the enjoyment of his civil rights or be discriminated against in the exercise thereof.

ton, 428 U.S. at 113–14; *Friedman,* 638 F.2d at 265. Also, the "thrust" or timing of the action in which the rights of the third party are raised, or the choice of forum, may conflict seriously with the third party's underlying interest. *Friedman,* 638 F.2d at 266; *Frissell v. Rizzo,* 597 F.2d 840, 848 (3d Cir.), *cert. denied,* 444 U.S. 841, 100 S.Ct. 82, 62 L.Ed.2d 54 (1979). Finally, third parties are usually the best proponents of their own rights. *Singleton,* 428 U.S. at 114, 96 S.Ct. at 2874; *Friedman,* 638 F.2d at 266; 13 C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* § 3531 at 211–12 (1975).

The rule has special force in the present case, where the interests of the plaintiffs are essentially opposed to any interests that non-party Maine firms might assert. The plaintiffs seek to deny public funding to BIW; yet their equal protection claim is, in essence, that all Maine firms are entitled to public funding. *See Friedman,* 638 F.2d at 264–68; *Pacific Gas & Elec. Co. v. Mounteer,* 66 Cal.App.3d 809, 136 Cal.Rptr. 280 (1977); *Wirth v. Ehly,* 93 Wis.2d 433, 287 N.W.2d 140 (1980).

▋ It is true that the Supreme Court has developed a number of exceptions to the rule against asserting third-party claims.[4] Thus, a litigant may assert the constitutional claims of absent third parties who would otherwise be denied a judicial forum, *Eisenstadt v. Baird,* 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972); *Barrows v. Jackson,* 346 U.S. 249, 73 S.Ct. 1031, 97 L.Ed. 1586 (1953), whose rights would be impaired if the third parties had to assert those rights directly, *NAACP v. Alabama ex rel. Patterson,* 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958), or who have a special relationship with the litigant, *Griswold v. Connecticut,* 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965); *Pierce v. Society of Sisters,* 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925). However, those cases all involve assertion of third-party rights that

are congruent with the interests of both the litigant and the third party.

▋ The plaintiffs suggest, however, that they should be able to present the equal protection claim as a matter of judicial economy. We are unconvinced.

If the plaintiffs believe their situation is special because they already have standing to raise other claims, they misconceive the nature of the third-party rule. The correct view has been expressed as follows:

> Although the conclusion is commonly expressed in terms of 'standing,' . . . most of the decisions do not involve the right of the litigant to be in court. On the contrary, the question commonly arises in defining the extent of the issues that a court will decide at the behest of a party who is quite properly in court for some purposes.

13 C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* § 3531 at 205 (1975). *See, e.g., Friedman,* 638 F.2d at 268; *Pacific Gas & Elec. Co.,* 66 Cal.App.3d at 813–14, 136 Cal.Rptr. at 282.

Any judicial economy from hearing the equal-protection claim would be false economy. The risks of third-party standing—adjudicating rights unnecessarily and without the help of the best proponent, the third party—are especially grave when the interests of the in-court litigant and the third party are basically opposed. We decline to consider the plaintiffs' equal-protection claim.

B. *Plaintiffs' Standing to Challenge the BIW Project Under the Maine Constitution, Article IV, Part Third, Section 1 and Article IX, Section 14.*

The plaintiffs' principal argument on the merits is based on the proposition that the Legislature may not authorize the issuance of general obligation bonds of the state except for a public purpose. Plaintiffs regard the expenditure of public money in developing the Portland project as a form

---

4. *See generally* L. Tribe, *American Constitutional Law* § 3–26 (1978); Sedler, *Standing to Assert Constitutional Jus Tertii in the Supreme Court,* 71 Yale L.J. 599 (1962); Note, *Standing to Assert Constitutional Jus Tertii,* 88 Harv.L. Rev. 423 (1974).

of financial aid to BIW. They contend that such funding is not for a public purpose and hence violates article IV, part third, section 1 of the Maine Constitution as heretofore construed by this Court.[5] The plaintiffs contend also that the project agreements call for the credit of the state to be "directly or indirectly loaned" in violation of the first sentence of article IX, section 14 of the Maine Constitution.[6]

BIW contends that the plaintiffs' status as taxpayers does not suffice to give them standing to bring this suit inasmuch as they suffer no special injury setting them apart from Maine taxpayers in general. Although this Court held in *Cohen v. Ketchum,* 344 A.2d 387 (Me.1975), that taxpayers without special injury have standing under 14 M.R.S.A. § 6051(13) to seek preventive relief against asserted illegal action by a local governmental unit,[7] we have not heretofore decided the question of taxpayer standing at the state level.

BIW relies, in part, on a series of decisions that, in general, deny standing to federal taxpayers without special injury who seek to challenge actions of the federal government in federal court. *See, e.g., Valley Forge Christian College v. Americans United for Separation of Church & State,* 454 U.S. 464, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982); *Schlesinger v. Reservists Committee to Stop the War,* 418 U.S. 208, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974); *United States v. Richardson,* 418 U.S. 166, 94 S.Ct. 2940, 41 L.Ed.2d 678 (1974); *Frothingham v. Mellon,* 262 U.S. 447, 43 S.Ct. 597, 67 L.Ed. 1078 (1923). The state supreme courts are not bound, of course, by the Supreme Court's decisions on standing in federal court, and the great majority of states permit their taxpayers to sue to enjoin illegal expenditures by state officials. Jaffe, *Standing to Secure Judicial Review: Public Actions,* 74 Harv.L.Rev. 1265, 1276–

**5.** Article IV, part third, section 1 of the Maine Constitution gives the Legislature "full power to make and establish all reasonable laws and regulations for the defense and benefit of the people of this State, not repugnant to this Constitution, nor to that of the United States." The requirement of a "public purpose" as a justification for taxation has been read into that provision as a constitutional limitation on the Legislature's broad power to make laws for the benefit of the people. *See, e.g., Crommett v. City of Portland,* 150 Me. 217, 107 A.2d 841 (1954); *Opinion of the Justices,* 118 Me. 503, 510, 106 A. 865, 870 (1919); R. Beck, *The 1965 Maine Municipal, Industrial and Recreational Obligations Act,* 18 Me.L.Rev. 25, 26 n. 5 (1966).

**6.** Me. Const. art. IX, § 14 provides, in pertinent part, as follows:

The credit of the State shall not be directly or indirectly loaned in any case, except as provided in Sections 14–A, 14–C, 14–D and 14–E. The Legislature shall not create any debt or debts, liability or liabilities, on behalf of the State, which shall singly, or in the aggregate, with previous debts and liabilities hereafter incurred at any one time, exceed two million dollars, except to suppress insurrection, to repel invasion, or for the purposes of war, and except for temporary loans to be paid out of money raised by taxation during the fiscal year in which they are made; and excepting also that whenever two-thirds of both Houses shall deem it necessary, by

proper enactment ratified by a majority of the electors voting thereon at a general or special election, the Legislature may authorize the issuance of bonds on behalf of the State at such times and in such amounts and for such purposes as approved by such action .... Whenever ratification by the electors is essential to the validity of bonds to be issued on behalf of the State, the question submitted to the electors shall be accompanied by a statement setting forth the total amount of bonds of the State outstanding and unpaid, the total amount of bonds of the State authorized and unissued, and the total amount of bonds of the State contemplated to be issued if the enactment submitted to the electors be ratified....

The excepted provisions (§§ 14–A, 14–C, 14–D and 14–E) authorize the state to insure mortgage loans to assist in settling or resettling within the state industrial, manufacturing, fishing, agricultural and recreational enterprises; to insure payment of Maine School Building Authority revenue bonds; to insure mortgage loans on Indian housing; and to insure Maine veterans' mortgage loans.

**7.** 14 M.R.S.A. § 6051(13) (1980) provides that the Superior Court shall "have full equity jurisdiction, according to the usage and practice of courts of equity, in all other cases where there is not a plain, adequate and complete remedy at law."

81 (1961); Note, *Taxpayers' Suits: A Survey and Summary,* 69 Yale L.J. 895 (1960); Note, *Taxpayers' Suits as a Means of Controlling the Expenditure of Public Funds,* 50 Harv.L.Rev. 1276 (1937). *See, e.g., Zeigler v. Baker,* 344 So.2d 761 (Ala.1977); *Stanson v. Mott,* 17 Cal.3d 206, 551 P.2d 1, 130 Cal.Rptr. 697 (1976); *McKee v. Likins,* 261 N.W.2d 566 (Minn.1977). Various reasons—none of them entirely satisfactory—have been proffered to justify the difference in treatment of taxpayers' suits at the state and federal levels. A taxpayer's interest in expenditures out of the federal treasury is said to be comparatively minute and remote. *See Frothingham v. Mellon,* 262 U.S. at 486–87, 43 S.Ct. at 600–601 (distinguishing local and federal taxpayer standing.)[8] A large percentage of federal funds is devoted to the sensitive areas of defense and foreign affairs where judicial intervention with resulting publicity might damage the security of the country. *See* Note, *Taxpayers' Suits: A Survey and Summary, supra* at 918. The special requirement of a "case or controversy" for federal jurisdiction under article III of the federal constitution is also cited as a basis for the difference. *McKee v. Likins,* 261 N.W.2d at 570 n. 4; Note, *Taxpayers' Suits: A Survey and Summary, supra* at 918.

An argument sometimes advanced for denying standing to taxpayers without special injury is that the denial tends to protect state officials from being harassed by litigation at the instance of plaintiffs who dislike the policies the officials are carrying out, particularly where the plaintiffs have lost in the political arena. The difficulty with this line of thought is that, in effect, it prejudges the very issue sought to be raised: namely, the legality of the governmental acts in question. Protection of state officials from harassment by litigation is only a by-product of the denial of standing; whether that by-product is desirable in any particular case cannot be determined without examining the merits of the claim. If the official conduct involved is indeed unconstitutional, protecting the officials in question from harassment cannot be deemed a desirable end in itself.

The chief argument against taxpayer standing in cases like the present is that the acknowledgement of such standing opens a door to litigation over decisions made at the highest levels of state government. Such litigation places the courts in the difficult position of having to review those decisions, reached by operation of the political process, often after controversy, for conformity to the provisions of the state and federal constitutions. Although the courts must undertake that review by a rational, not political, process, when they do so they are more likely than usual to incur politically inspired criticism from the disappointed litigants and their adherents. Hence, if the highest consideration were protection of the courts from becoming enmeshed in political controversy, it would be best to deny standing to taxpayers in suits like this one.

However, other considerations must be taken into account. One is that, other than a taxpayers' suit, there is no mechanism available in the government of Maine for preventing the BIW project from being carried out if the project should indeed entail unconstitutional expenditures by the defendant state officials. It is apparent that the project will not be stopped by the attorney general, who has vigorously defended the state and its officials throughout the action. It would conflict with the basic theory of American government if two branches of government, the legislative and the executive, by acting in concert were able, unchecked, to frustrate the mandates of the state constitution.

■ Second, and equally important, it is a central function of American courts to protect and relieve the individual from injurious unconstitutional conduct by govern-

**8.** The Supreme Court's emphasis in *Frothingham* on the minuteness and remoteness of a federal taxpayer's interest has been criticized; the interest of many large corporate taxpayers may be neither remote nor minute under today's federal tax structure. Jaffe, *Standing to Secure Judicial Review: Public Actions,* 74 Harv.L.Rev. 1265, 1293–95 (1961).

ment officials. Where taxpayers offer to show that such conduct has occurred, that it threatens to injure them by increasing their taxes, and that it cannot be stopped except by judicial intervention, a court having all the powers of a court of equity may not turn them away because possible political repercussions from the ultimate decision on the merits may lead to hostile criticism of the judiciary. We therefore reject the proposition that taxpayers without special injury may never have standing to challenge illegal state action.

When we examine the position of the taxpayer plaintiffs in this particular case, we note that certain considerations that sometimes counsel judicial abstention are absent. The law to be construed and applied is no more obscure than usual; to decide the case, it is not necessary to resort to adumbrations from highly abstract principles thought to be implicit in provisions of the state or federal constitution. There will be no problem in this case with the effectiveness of a judgment either granting or denying the relief sought. There will be no difficulty in managing the enforcement of a judgment either for or against the plaintiffs. The case is not one in which the Court must look to a protracted and difficult regime of judicial supervision to effectuate the decision.

Cases sometimes arise in which the issues, though technically presented, are not posed in an adversary context because the litigants do not have truly adverse interests in the outcome. In such cases the courts often withhold the exercise of their power to decide, on the ground of a lack of standing. Obviously this is not such a case.

This is not a taxpayers' suit where the gravamen of the complaint is the alleged violation of a statute or constitutional provision having little or no direct connection with plaintiffs' tax liability. We intimate no opinion about the standing of taxpayers without special injury to bring a suit of that sort. Here, indeed, the plaintiffs, as taxpayers, assert their own direct interest in the enforcement of a provision of the Maine Constitution which, as construed by this Court, is aimed precisely at protecting taxpayers from having their tax dollars used for private purposes. The plaintiffs assert also a direct interest in the enforcement of a constitutional provision designed to prevent the state from becoming overburdened with debt. Again, the taxpayers of the state are surely among the principal intended beneficiaries of that provision.[9] See Note, *Legal Limitations on Public Inducements to Industrial Location,* 59 Colum. L.Rev. 618, 619–23 (1959).

The foregoing considerations suggest strongly that plaintiffs in this case should have standing to seek relief in some form on the basis of their claims under the Maine Constitution, article IV, part third, section 1, as construed by this Court, and article IX, section 14. The question remains: What form of relief do they have standing to request?

In the municipal setting, this Court has held that taxpayers who do not allege and prove special injury have standing to seek only "preventive" relief from illegal actions by municipal officers.[10] *Buck v. Town of*

**9.** Plaintiffs may not be denied standing merely because they have not shown that the Portland project will actually increase their tax burden. Otherwise state ventures violating the Maine Constitution would be insulated from taxpayer suit in any case where they gave promise of yielding sufficient taxes to offset the initial cost to the state. In this case no one can predict with certainty how the BIW project will affect the economy of Maine. BIW is not contractually bound to maintain any particular level of employment in Portland. Although BIW's experts testified that the project will pay for itself in higher tax returns, one of Common Cause's experts testified that the evidence is strong that, in general, state business incentives do not influence income or employment within the state. The only certainty is that Maine taxpayers will eventually have to repay the bonded debt for the project.

**10.** "Preventive" relief is contrasted with "remedial" relief in the Maine cases, apparently with the idea that preventive relief is purely prospective in effect, while "remedial" relief seems to encompass awards of a restitutionary nature. *E.g., Eaton v. Thayer,* 124 Me. 311, 128 A. 475 (1925) (restitution by officials to the

**Yarmouth,** 402 A.2d 860 (Me.1979); *Heald v. School Administrative District No. 74,* 387 A.2d 1 (Me.1978); *Cohen v. Ketchum,* 344 A.2d 387 (Me.1975); *Blodgett v. School Administrative District No. 73,* 289 A.2d 407 (Me.1972); *Tuscan v. Smith,* 130 Me. 36, 153 A. 289 (1931); *Eaton v. Thayer,* 124 Me. 311, 128 A. 475 (1925). In characterizing relief as "preventive" or "remedial" in particular cases, the Court has adopted a restrictive approach. *See Cohen,* 344 A.2d at 394.

If the rule in municipal taxpayers' suits restricting standing to preventive relief were extended to apply to taxpayers' suits against the state, plaintiffs here would seem at first glance to have standing to press their demand that the state be enjoined from transferring funds to BIW for a purpose that plaintiffs say is unlawful under the Maine Constitution. Since no bond proceeds have yet been transferred, it might appear easy to conclude that such relief, at least, would be "preventive" in nature. However, examination of *Cohen v. Ketchum,* 344 A.2d 387 (Me.1975), makes it doubtful that a simple extension of the entire doctrine of the Maine municipal cases to state taxpayers' suits would be desirable.

In *Cohen,* a resident taxpayer without special damage sought to restrain a school board from issuing school construction bonds on the grounds that the board was malapportioned and the warrant defective that called for the election at which the bond issuance was voted on. This Court said plaintiffs had standing to seek preventive relief but, as one alternative ground for ultimately denying all relief, held that the plaintiffs lacked standing because they were demanding "remedial", not "preventive", relief in seeking an injunction against the issuance of the construction bonds. The bonds had been approved by the voters but not yet issued. The board had yet to determine the dates, denomination, interest rate, method of sale, minimum purchase price,

and dates of maturity of the bonds. The Court took the position that those actions, yet to be undertaken, were "truly the implementation of a capital construction commitment already in essence undertaken" (*id.* at 394) and held that the plaintiffs, not being entitled to any kind of "remedial" relief, could not have the "foundational commitment" to the school construction project "which has thus already come into existence" vacated and set aside. (*Id.*) However, the Court in *Cohen* then went on to consider the grounds underlying the plaintiffs' claims and denied relief on the merits on all but one of them.

If this Court's characterization of the relief sought by the municipal taxpayer plaintiffs in *Cohen* were to be deemed applicable to the plaintiffs' demands in the instant case—namely, that the state and its designated officials be enjoined from issuing bonds and transferring funds to BIW under the agreements—there is no sensible distinction between the *Cohen* situation and the one presented by the instant case. A "foundational commitment" to the BIW project would appear to have "already come into existence" to the same extent as the commitment to the school construction project in *Cohen.* It becomes necessary, therefore, to examine the basis in the Maine municipal taxpayer cases for the traditional restriction of standing to preventive relief at the local level.

The opinion in *Blodgett v. School Administrative District No. 73,* 289 A.2d 407, 408–13 (Me.1972), contains a history of the restriction on standing in municipal cases. The language of the original statute authorizing suits by ten or more taxpayers against municipalities and their officers for certain illegal fiscal activities provided that a justice of the Supreme Judicial Court could hear and determine the suit in equity and, during the litigation, could issue injunctions and make orders "to restrain or

municipal treasury, and nullification of certain completed transactions, *held* "remedial"); *Cohen v. Ketchum,* 344 A.2d 387, 393 (Me.1975) (nullification of bond-issuance election *held*

"remedial"). In ordinary legal parlance, the term "remedy" is used to include preventive as well as non-preventive forms of relief.

prevent" violations. P.L. 1864, ch. 239, § 1, as amended by P.L. 1865, ch. 302, §§ 1, 2. The language "restrain or prevent" disappeared from the provision in the Revised Statutes of 1871[11] and does not appear in any of the subsequent versions of the ten-taxpayers statute, including the current provision, applicable to the Superior Court, in 14 M.R.S.A. § 6051(12) (1980).

Although full equity jurisdiction was conferred on the Supreme Judicial Court in 1874[12] and on the state-wide Superior Court in 1930,[13] the restriction on standing under the ten-taxpayers statute persisted. The Court has said that suit by the attorney general to obtain remedial—i.e., restitutionary—relief from municipal officials violating the statute was superior to letting the taxpayers have such relief, on the ground that municipal officers should "not be subjected to litigation at the suit of every dissatisfied taxpayer", *Bayley v. Inhabitants of Wells,* 133 Me. 141, 145, 174 A. 459, 461 (1934).

The question arises whether the restriction to preventive relief in municipal cases should be extended to apply in taxpayers' suits against the state and its officials where the plaintiffs do not show any special injury. In effect, the restriction operates as a threshold bar to any demand by such taxpayers for non-preventive relief. On this issue, arguments from history derived from possible limitations on the original equity jurisdiction of Maine courts in municipal taxpayers' suits must be regarded as attenuated at best. *See Blodgett v. School Administrative District No. 73,* 289 A.2d 407, 408–13 (Me.1972). Subsection 12 of 14 M.R.S.A. § 6051 does not in terms apply to taxpayer suits against the state and has never been construed to do so. In contrast with many of the cases involving illegal action of municipal officers, the present case is not one in which the attorney gener-

al can be regarded as available to vindicate any claim that the agreement of the state, city and BIW is illegal under the Maine Constitution. *Cf. Fitzgerald v. Baxter State Park Authority,* 385 A.2d 189 (Me. 1978) (attorney general not available to enforce trust terms against the state). Thus, if a restriction is now to be placed on plaintiffs that their standing is to obtain only preventive relief, that restriction must be imposed essentially by judicial fiat. The state and municipal situations are not analogous.

■ The controlling legislation, 14 M.R.S.A. § 6051 (1980), providing that the Superior Court shall have "full equity jurisdiction, according to the usage and practice of courts of equity, in all other cases where there is not a plain, adequate and complete remedy at law," gives no hint in its sweeping language that the jurisdiction thus conferred is to be narrowed by some threshold restriction on the remedies normally available to an equity court. It is a well-established principle of equity that once having taken jurisdiction of the cause and reached a decision, an equity court should and must fashion appropriate remedies to do complete justice. "Equity delights to do justice, and that not by halves." Story, *Commentaries on Equity Pleadings* § 72 (10th ed. 1892). Nothing in the language of 14 M.R.S.A. § 6051(13) suggests that that principle should be ignored, in effect, by adopting a threshold bar denying a plaintiff's *standing* to seek non-preventive relief. It is more in accord with principle to let the equity court hear the cause, determine what, if any, relief is appropriate in the light of all the facts, and then shape its decree accordingly. In particular cases against the state, one or more of the considerations that have tended to support the standing bar to non-preventive relief in municipal taxpayers' suits may

---

11. R.S.1871, ch. 77, § 5. Presumably the provision authorizing preventive orders *pendente lite* was deleted as surplusage in view of the fact that, by the very terms of the ten-taxpayers statute itself, the suit would be determined "in equity."

12. P.L.1874, ch. 175, now applicable to the Superior Court under subsection 13 of 14 M.R. S.A. § 6051 (1980).

13. P.L.1929, ch. 141, § 7, eff. Jan. 1, 1930.

cause the equity court, in the exercise of its judicial discretion, to deny some forms of such relief, but the court will be in a better position, having heard the case on the merits, to make an informed and intelligent judgment on the appropriate remedy.

For the foregoing reasons, plaintiffs, as taxpayers, have standing to seek to enjoin state funding of the Portland project as violative of the Maine Constitution, article IV, part third, section 1, and article IX, section 14.

## II. VALIDITY OF THE BOND REFERENDUM

The bond referendum authorized by chapter 75 of the 1981 Private and Special Laws asked, as "Referendum Question No. 1":

Shall a bond issue be ratified in the amount of $33,300,000 for agricultural and economic development, including airport improvements, port facilities which may be made available by sale or lease for use by public or private users, feed grain terminal facilities and potato storage and centralized packing facilities?

The plaintiffs challenge the validity of the referendum on two grounds: first, that the referendum did not present the BIW project to the voters as a separate question, and, second, that the wording of the question misled the voters.

The great majority of state constitutions provide that a statute shall not embrace more than one subject or object. *See* 1A J. Sutherland, *Statutory Construction* § 17.01 (4th ed. C. Sands 1972); Ruud, *"No Law Shall Embrace More Than One Subject"*, 42 Minn.L.Rev. 389 (1958). Applied to referenda, the provision is intended to protect voters from legislative logrolling and from having to vote for a proposal they dislike in order to get one they want. *New Jersey Association on Correction v. Lan,* 80 N.J. 199, 403 A.2d 437 (1979). See Annot., 4 A.L.R.2d 617, 626–27 (1949).

14. There is authority that in the absence of an express constitutional provision, multipurpose legislation is permissible. *Preservation Society v. Assessor of Taxes,* 99 R.I. 592, 209 A.2d 701

The Maine Constitution contains no such provision, but the plaintiffs urge that a single-object rule be imported by judicial construction into the procedure for bond referenda set forth in article IX, section 14, to assure the voters fuller freedom of choice. If such a rule were in place, plaintiffs contend, the referendum question at issue would be invalid as embracing more than one object. Plaintiffs argue that the diverse projects presented in Question No. 1 had nothing in common with one another. Because we do not agree with that conclusion, it is unnecessary to address the argument that the single-object rule should be treated as an implied feature of the Maine Constitution.[14]

Courts that apply the single-object rule do so cautiously to avoid hamstringing government, *New Jersey Association on Correction,* 80 N.J. at 213, 403 A.2d at 444, and requiring piecemeal legislation that multiplies the number of necessary enactments and complicates their interrelationships. *Gellert v. State,* 522 P.2d 1120, 1122 (Alaska 1974). Where the rule is in force, it is held to require only that the legislation or referendum proposition embrace one general subject. *E.g., Gellert,* 522 P.2d at 1123; *New Jersey Association on Correction,* 80 N.J. at 215, 403 A.2d at 445; *State ex rel. Foreman v. Brown,* 10 Ohio St.2d 139, 226 N.E.2d 116 (1967). The fact that all the projects within the scope of Question No. 1 are for the purpose of economic development interrelates them sufficiently to satisfy any single-object requirement.

The plaintiffs submit also that the wording of Question No. 1 misled the voters in two respects: first, that the voters would not have expected "port facilities" to consist of a privately owned ship building and repair facility; second, that they would not have expected a "sale or lease" to include arrangements that make no provision for direct recovery by the state of its expendi-

(1965); 1A J. Sutherland, *supra* at 2. *See Cohen v. Ketchum,* 344 A.2d 387, 399 (Me.1975) (local bond referendum).

tures in renovation of the dry dock. They cite *Opinion of the Justices,* 283 A.2d 234, 236 (Me.1971), for the proposition that a referendum "presented to the voters by means of a question which is clearly misleading is void and of no effect."

■ We consider those challenges bearing in mind that it is important to efficient operation of the state government that there be a high degree of finality in referendum votes. After the electorate has acted, every reasonable intendment will be indulged in favor of the validity of the vote. *Opinion of the Justices,* 261 A.2d 250, 253 (Me.1970). *See generally* Note, *Avoidance of an Election or Referendum When the Electorate Has Been Misled,* 70 Harv.L.Rev. 1077, 1078–82, 1092–94 (1957).

■ In preparation for the referendum, a specimen ballot was prepared containing an explanation by the attorney general of each question being put before the voters. Copies of the specimen ballot were published in the newspapers and posted at the polling places. The explanation for Question No. 1 stated, in pertinent part:

> With respect to port facilities, the Legislature intends that part of the proceeds be used for a shipyard development in cooperation with Bath Iron Works . . . .
>
> . . . The port facilities authorized by this Act could be operated by the State or could be made available by sale or by lease to public or private users. At present, it is the State's intent that certain of these facilities, principally a drydock to be located in Portland, be made available for use by Bath Iron Works.

The attorney general's explanation accords with the definition of "port facilities" in the statute authorizing the referendum (P. & S.L. 1981, ch. 75, § 6). There is no inconsistency between the language of the ballot or specimen ballot and the provisions of chapter 75.

In view of the explanation on the specimen ballot, this Court cannot infer that the voters were led by use of the term "port facilities" into supposing that the proceeds of the bond issue would not be used for shipbuilding facilities consisting of a dry dock operated by BIW. Question No. 1 was not "clearly misleading" in its use of the term "port facilities."

■ The challenge based on the use of the term "sale or lease" in Question No. 1 presents more difficulty. The argument, posed most sharply, is that by using the term "sale or lease" in Question No. 1, the state misled the voters into supposing that it intended to make arrangements that would provide for payment of rent or some other direct recovery of the state's investment in the dry dock. Whether the referendum language was misleading must be determined by reference to facts, including the intentions of the state, as they existed in November, 1981. Plaintiffs cite the February, 1982 agreement as evidence of the state's intention in the summer and fall of 1981 not to include provisions for direct recovery in the ultimate agreement.

Plaintiffs concentrate on the words "sale or lease" in Question No. 1 as conveying the asserted misimpression. Observing that the arrangements for the dry dock do not provide for substantial rent, they argue that the transaction amounts to a gift. However, the arrangements, both tentative and final, create in BIW an exclusive right of possession for a period of years with reversionary rights in the state—salient features of a lease—and bind BIW to perform financial and other obligations constituting substantial consideration for BIW's right to use the dry dock. Even if plaintiffs should be right in insisting that a practical consequence of the transaction is a high degree of subsidization of BIW in its renovation of the dock, the arrangement is at least arguably a lease [15] and is certainly not a gift.

---

**15.** *See* 3 G. Thompson, *Commentaries on the Modern Law of Real Property* § 1051 (J. Grimes repl. ed. 1980) ("It is not necessary that the consideration supporting the lease be for a fixed amount of money. The rent may be partly or entirely in the form of other property or services."). No particular form of words is necessary for an instrument to constitute a

Whatever may be the technical accuracy of the term "lease", the explanation on the specimen ballot sufficiently informed the voters that the state planned to obtain a dry dock and make it available to BIW for use in shipbuilding. Common sense suggests that the merely technical characterization of the arrangement would not have mattered to the voters; that they would have voted exactly as they did had the ballot referred to a "transfer", as chapter 75 authorized. The real problem is whether they were misled because the ballot omitted to say that the projected arrangements did not require the state to recover its outlay directly from BIW.

In effect, this Court is being asked to rule, as a matter of law, that the referendum must be set aside on the ground that, by using the words "sale or lease" in Question No. 1, the state created the impression, contrary to fact, that it intended to provide in the projected arrangements for direct recovery of the state's investment in the dry dock. We decline to do so. Question No. 1 was not so clearly misleading as to warrant the drastic remedy of invalidating the referendum.

This is not a case where the ballot contains a plain misrepresentation of a material fact or where the language of the ballot is inconsistent with the terms of the statute authorizing the referendum. It is a matter of conjecture whether the use in Question No. 1 of the term "sale or lease" would have had, in itself, the effect of creating in the ordinary voter an expectation that direct recovery of the investment would be a feature of the projected arrangements. The plaintiffs' real complaint about the wording of the ballot is that it did not in some way alert the voters to the risk that the state might not get its money back because there would be no direct recovery of the invest-

ment. But if the likelihood of recovery is the ultimate concern, the ballot or specimen ballot, to be accurate, would also have had to reveal that a state planning study showed the state would recover its investment indirectly. The study predicted that the project would stimulate commerce and employment to a degree that the resulting tax revenues would fully recover the state's expenditures. The plaintiffs, in turn, would insist on countering with their own studies. Ultimately it would become necessary, to avoid "misleading" the voters, to make the ballot reflect most of the arguments that have been advanced by the parties to this action, both in their public debates and before this Court. To adopt the plaintiffs' position would lead to undesirable complication of ballots and breed footless litigation over bond referenda. Disputes about the merits of bond issues are ordinarily best left to the political arena.

Referendum Question No. 1 was not so "clearly misleading" as to require that the referendum be set aside.

III. PLAINTIFFS' CLAIMS UNDER ARTICLE 4, PART THIRD, SECTION 1 OF THE MAINE CONSTITUTION: THE PUBLIC–PURPOSE DOCTRINE.

 To be constitutionally valid, taxation at either the state or local level must be for a public purpose. *E.g., Crommett v. City of Portland,* 150 Me. 217, 107 A.2d 841 (1954); *Opinion of the Justices,* 152 Me. 440, 131 A.2d 904 (1957). A corollary of that proposition is that the expenditure of public funds must be for a public purpose. *Maine State Housing Authority v. Depositors Trust Co.,* 278 A.2d 699 (Me.1971).[16] The requirement of public purpose operates as a limitation on the power granted to the Leg-

---

lease, nor is reservation of the payment of rent *eo nomine. Buswell v. Wentworth,* 134 Me. 383, 389, 186 A. 803, 806–07 (1936). However, in the construction of a particular instrument, if it is doubtful whether a lease was intended, the fact that rent was not reserved, explicitly or

implicitly, becomes an important consideration. *Buswell,* 134 Me. at 390, 186 A. at 807.

**16.** *Cf. State v. Rand,* 366 A.2d 183, 192 (Me. 1976) (disposition of private funds held in trust by a municipality, deemed not subject to the public-purpose doctrine).

islature by article IV, part third, section 1 of the Maine Constitution, the legislative powers clause.[17]

■ The Superior Court declined to decide for itself whether the arrangements for the Portland project are for a public purpose. Instead, the court viewed the two-step legislative and voter approval as a "conclusive declaration, binding upon the courts, that the purpose of the proposed expenditures is a public one." The court rested its theory on two premises. The first was that because the public-purpose doctrine is rooted in the legislative powers clause rather than the takings clause or due process clause of the Maine Constitution, the doctrine must be purely a fiscal limitation rather than one protecting individual property rights.[18] As a consequence, the trial justice thought the Legislature might, with formal approval of the electorate, spend public money as it sees fit. The court's second premise was that the procedure for authorization of bond issuance in article IX, section 14 (requiring a two-thirds legislative vote and a subsequent majority vote of the electorate) parallels the procedure required to amend the Maine Constitution itself. We disagree with the Superior Court's theory and find it necessary to reach the merits of the public-purpose question.

A long line of Maine cases has held that although legislative findings of public purpose are entitled to great weight, *e.g., Maine State Housing Authority,* 278 A.2d 699 (Me.1971); *Crommett v. City of Portland,* 150 Me. 217, 107 A.2d 841 (1954); *State v. Vahlsing, Inc.,* 147 Me. 417, 88 A.2d 144 (1952); *Laughlin v. City of Portland,* 111 Me. 486, 90 A. 318 (1914), the question of public purpose is ultimately a matter for

determination by the courts. *Maine State Housing Authority,* 278 A.2d at 702; *Crommett,* 150 Me. at 231, 107 A.2d at 849; *Vahlsing,* 147 Me. at 426, 88 A.2d at 149; *Laughlin,* 111 Me. at 489–90, 90 A. at 319; *Brewer Brick Co. v. Brewer,* 62 Me. 62 (1873); *Allen v. Inhabitants of Jay,* 60 Me. 124 (1872). *See* C. Rhyne, *The Law of Local Governmental Operations* § 31.4 (1980).

■ The Superior Court attempted to distinguish our earlier public-purpose cases as lacking the element of voter approval present here. The distinction is not significant. In the first place, the wording of the referendum question gave the voters no reason to suppose that a favorable vote amounted to a decision that the bond issue was entirely for a public purpose. The issue posed by the referendum question was whether the state should borrow $15 million, not whether the $15 million would be spent for a public purpose. Apart from the wording of the referendum ballot, the conclusive-declaration theory, if adopted, would distort the long-established system of checks and balances in the government of the state. It would virtually empower the Legislature, with voter approval, to exercise its spending power beyond the pale of judicial review unrestrained by constitutional limitations. *See Inhabitants of Warren v. Norwood,* 138 Me. 180, 24 A.2d 229 (1942) (it is a proper function of the Law Court to define the limits of legislative power). The voters may not sanction constitutional violations by the Legislature. "Unless and until changed by formal amendment, present provisions of the Constitution bind not only the Legislature but the people." *Opinion of the Justices,* 132 Me. 519, 522,

---

**17.** *See* note 5 *supra.* Me. Const. art. IV, pt. 3, § 1 provides, in pertinent part, as follows:

The Legislature, with the exceptions hereinafter stated, shall have full power to make and establish all reasonable laws and regulations for the defense and benefit of the people of this State, not repugnant to this Constitution, nor to that of the United States.

**18.** The takings clause provides: "Private property shall not be taken for public uses without just compensation; nor unless the public exigencies require it." Me. Const. art. I, § 21.

The due process clause provides: "No person shall be deprived of life, liberty or property without due process of law . . . ." Me. Const. art. I, § 6–A.

174 A. 845, 846 (1933).[19] *See also Opinion of the Justices,* 159 Me. 209, 215, 191 A.2d 357, 360 (1963).

█ Finally, it is immaterial that the procedure for bond issuance in article IX, section 14, parallels the procedure required to amend the constitution itself. The bond referendum was never put to the voters as altering or abolishing the public-purpose doctrine. At no stage did the wording of the referendum or the public debates even hint to the voters that their vote might amend the Maine Constitution. The referendum may not be metamorphosed into an ad hoc constitutional amendment. *Wallace v. Zinman,* 200 Cal. 585, 254 P. 946 (1927); *People v. Prevost,* 55 Colo. 199, 134 P. 129 (1913); *State v. Schluer,* 59 Or. 18, 115 P. 1057 (1911) (by implication). *Cf. Opinion of the Justices,* 137 Me. 350, 19 A.2d 53 (1941) (constitutional amendment and its implementation cannot be concurrently put to the electorate). Consequently this Court has the unavoidable responsibility of determining whether the arrangements for the BIW project are for a public purpose and hence within the constitutional authority of the state and city to carry out.

█ Two well-established principles provide the baseline for analysis of the crucial constitutional issues in this case. First, although the Court must decide on the constitutionality of the arrangements in question, it is not for the Court to assess their wisdom or efficacy as a matter of economic or fiscal policy. *State v. Karmil Merchandising Corp.,* 158 Me. 450, 186 A.2d 352 (1962); *Camp Emoh Associates v. Inhabitants of Lyman,* 132 Me. 67, 166 A. 59 (1933). If the project has a rational basis, we may not strike it down merely because, if we were acting in the role of voters or legislators, we would deem it unwise.[20]

█ Second, the burden of persuasion is on the plaintiffs, who assert the unconstitutionality of legislative and executive acts establishing the arrangements. *Union Mutual Life Ins. Co. v. Emerson,* 345 A.2d 504, 507 (Me.1975). Before we consider the plaintiffs' contentions, it is necessary to determine precisely what acts of the state we are reviewing.

The preamble and statement of purpose in chapter 75 of the Private and Special Laws of 1981, authorizing the state bond referendum, reveal the following declarations, among others, by the Maine Legislature:

> There is a statewide need to provide for a greater utilization of the public ports and harbors . . . and to increase the flow of

**19.** It would be incorrect to characterize all our earlier public-purpose cases as lacking the element of voter approval. In *Allen v. Inhabitants of Jay,* 60 Me. 124 (1872), this Court held unconstitutional a law enabling the town of Jay to lend $10,000 to a saw-mill and box manufacturing enterprise to induce it to locate in Jay. The local funds were to come from the issuance of town bonds, which had already been approved by a majority vote at a town meeting. The *Allen* Court phrased the question as "whether the legislature can constitutionally authorize the majority of a town to loan their own and the money of a minority raised by taxation and against the will of such minority . . . ." *Id.* at 127. It was immaterial that the town voters had approved the spending.

The Superior Court distinguished *Allen* as safeguarding the property rights of a relatively small group of people affected by an adverse town-meeting vote. The court said the losing voters who disapproved the bond referendum in the present case are not a tyrannized minority requiring judicial protection in view of their large numbers and the statewide publicity preceding the vote.

There are two problems with this distinction. First, we have no reason to assume that the voters of a small town are less informed about local bond issues than are state voters, who have to keep track of projects in all parts of the state. Second, if a public expenditure is illegal, it is no answer that all the taxpayers of Maine foot the bill instead of the few taxpayers in a single community.

**20.** Thus, testimony of an expert for plaintiffs that there is evidence that state business incentives do not influence income or employment within the state (*see* note 9, *supra*) is beside the mark. Such testimony has a tendency to show that the defendants and the Legislature may be mistaken in supposing that the benefits of improved commerce and higher employment will be achieved by the project. It does not tend to prove that the *purpose* of the arrangements is not a public one.

commerce, to thereby provide enlarged opportunities for gainful employment by the people of Maine and to thus ensure the preservation and betterment of the economy of the State for the benefit of its people.

It is determined to be a public purpose of the State to ... cause to be operated either by lease, sale, transfer or other conveyance to public or private users, in cooperation with the State Government, port facilities ... owned or leased by the State and to encourage and assist in the acquisition, financing, construction, renovation and operation of other port facilities ... within the State, to the end that the public ports and harbors, the port facilities located therein ... shall be utilized in a manner which will further the economic development of the State.[21]

The statute defines "port facilities" to include the following types of facilities located in or upon or appurtenant to any public port or harbor in the state:

Wharves and piers, with buildings and appurtenances; docks; slips; elevators; public warehouses; drydocks; ship docking and handling facilities; ship building overhaul and repair facilities; loading and unloading facilities for cargo of any type; marine terminal and construction facilities; and all lands, buildings, real estate improvements and furnishings, machinery, apparatus and equipment and other personalty used in connection with any of the foregoing.

For reasons set forth in Part II of this opinion, the referendum held pursuant to chapter 75 was not invalid on any ground that the ballot was misleading. It cannot be inferred from the language of the ballot that the voters intended to approve the issuance of bonds in order to fund expenditures for a nonpublic and hence unconstitutional purpose. Since executive officials of the state have signed the agreements, this Court is in the position, technically speaking, of reviewing action by the executive department, not an act of the Legislature. But the record leaves no doubt that chapter 75 was deliberately intended to support fully what the executive department has done. Since the basic aims of the legislative and executive branches are identical in this case, it is proper, in seeking to determine the purpose of the tripartite agreement, to resort to the purpose of the underlying legislation. As a consequence, in determining whether the arrangements agreed on require the state to spend public money for a nonpublic purpose, this Court must adopt the same approach it uses in deciding on the constitutional validity of legislation: The arrangements must be upheld as being for a public purpose unless it is clearly demonstrated that they are not. As this Court said in *Laughlin v. City of Portland*, 111 Me. 486, 489, 90 A. 318, 319 (1914),

It is not enough that the court be of the opinion that had the question been originally submitted to it for decision it might have held the contrary view. The question has been submitted in the first instance to the tribunal designated by the Constitution, the Legislature, and its decision is not to be overturned by the court unless no room is left for rational doubt. All honest and reasonable doubts are to be solved in favor of the constitutionality of the act. This healthy doctrine is recognized as the settled policy of this court. *State v. Doherty,* 60 Maine, 504; *State v. Pooler,* 105 Maine, 224 [74 A. 119]. 'The power of the judicial department of the government to prevent the enforcement of a legislative enactment by declaring it unconstitutional and void is attended with responsibilities so grave that its exercise is properly confined to statutes that are clearly and conclusively shown to be in conflict with the organic law. It is the duty of one department to presume that another has acted within its legitimate province until the contrary is made to appear by strong and convincing rea-

---

21. The legislative declaration that certain activities are for a "public purpose" would not, of course, be conclusive on the Court if it should find that those activities, as described, were in violation of the constitutional requirement.

sons.' *State v. Rogers,* 95 Maine, 94 [49 A. 564].

*Accord, Crommett v. City of Portland,* 150 Me. 217, 232, 107 A.2d 841, 850 (1954).

The purpose of the project, as declared in the preamble to the authorizing legislation, is to increase the flow of commerce in Portland, enhance employment opportunities, and improve the economy of the state.[22] The message of the Governor in support of the legislation and the legislative debate preceding enactment are consistent with that declaration.

Plaintiffs contend that judicial precedents in Maine clearly mark such an arrangement as one for a nonpublic purpose because neither will the shipyard be available for use by members of the public nor will its development and operation directly benefit the public, as, for instance, by eliminating conditions hazardous to public health or safety. The heart of plaintiffs' position is that the tripartite agreement calls for the state and city to subsidize a private profit-making project where the resulting industrial activity will benefit members of the public only indirectly and where there is no provision for direct recovery of the investment from the industry subsidized.

Plaintiffs go further. They assert not merely that the arrangements create a state subsidy to BIW but that the tripartite agreement itself is a fictitious contract under which the state and city obtain no real benefits in return for the benefits they confer on BIW. In plaintiffs' view, BIW has merely to carry on its business, doing essentially what it would have done anyhow but aided by the subsidy, while the state and city gain only the incidental benefits that may come from having the shipyard located in Portland. The plaintiffs argue that BIW's financial commitments to renovation of the dry dock, installation of capital equipment and operation of the shipyard obligate BIW to do nothing more than what good management of its own interests would have called for without any agreement. With respect to BIW's obligation to pay substantial annual rent on the pier lease, plaintiffs say that the amount of rent reserved will be inadequate to pay the debt and carrying charges created by the city bond issue covering the pier facilities.

We first consider plaintiffs' latter argument—that the tripartite agreement is a mere fiction to benefit BIW. We do not agree with plaintiffs that the agreement is fictitious or that BIW's legal obligation to carry out its financial and other commitments under the agreement may be ignored in deciding this case. The realities of the situation include the facts that BIW *is* legally obligated, that the state and city have bargained to have it so, and that BIW's obligations under the agreement go well beyond a mere commitment to locate a shipyard in Portland. The arrangements give the state and city a certain measure of assurance about the time, place, and manner of installation and operation of the shipyard facilities. The state and city promised to pay money and provide facilities in return for BIW's legal obligations to bring its new operation to Portland, renovate the dry dock, develop the pier, and operate the shipyard in certain ways and for certain times. This bargained-for exchange of obligations is not a gift, or even "in essence" a gift, nor can it be regarded as "fictitious" in any useful sense of the term. However, the question remains, whether the expenditures the state and city are obligated to make under the agreement will be for a public purpose.[23] Hence we proceed to the plaintiffs' subsidy argument.

---

**22.** For language of the preamble, see *supra* text accompanying note 21.

**23.** Plaintiffs also argue that if the business prospects for the new shipyard are so good, BIW could have financed the project entirely with private capital; hence the state subsidy was unnecessary in the first place. But the argument amounts only to a contention that the state and city gave up too much in their bargaining with BIW. Getting BIW to locate the shipyard in Portland was a prime objective of the state and city in the negotiations. We cannot say that provision for a subsidy was unnecessary in order to achieve that objective.

If there were no Maine precedents relating to legislation authorizing public financial aid to private business, it would be difficult for this Court, applying a deferential standard of review, to overturn the Legislature's characterization of the stated purposes of the Portland project as "public" in nature or its finding that the project is "for the benefit of the people." Revival of Portland's seaborne commerce and enhancement of Maine's employment opportunities are beyond question desirable ends. Reviewing the legislative and executive actions with the normal judicial deference on the question of their constitutional validity, we would find that the Legislature's statement of purpose was rationally supported by a state economic study and expert testimony tending to show that the projected arrangements would promote the announced legislative objectives.

The plaintiffs maintain, however, that under our precedents a general benefit to the economy is insufficient to validate a subsidy to private enterprise. In their view, whenever such a subsidy has been upheld, the Court has been able to find that the projected activity benefited the people as a whole because the end product of the subsidized activity was itself something that served the convenience and necessity of members of the public. They offer as examples *Dyar v. Farmington Village Corp.,* 70 Me. 515 (1878) (construction of railroads); *State v. F.H. Vahlsing, Inc.,* 147 Me. 417, 88 A.2d 144 (1952) (assistance in the marketing of products); *Crommett,* 150 Me. 217, 107 A.2d 841 (clearance of slums); *Maine State Housing Authority v. Depositors Trust Co.,* 278 A.2d 699 (Me.1971) (provision of low-income housing).

Plaintiffs are correct in their basic premise that the agreement has the effect of creating a subsidy to BIW out of public funds. The state is obliged to contribute as much as $20.1 million dollars of the first $24.6 million to be spent by BIW in rehabili-

tating the dry dock, without any right in the state to recover that amount, or the interest on it, from BIW by way of reserved rent or other payment. With respect to the provision that the dry dock is to be owned by the state and operated by BIW "on behalf of the state", since the state's ownership is subject to BIW's right to exclusive possession and use of the dock for forty years, during which the dock will be deteriorating from age, the state's present interest in the dock is of relatively minor value under the agreement. It cannot be sensibly argued that there is no subsidy merely because the improvements will be made in the state's own property. The reference to BIW's operation of the dry dock "on behalf of the state" seems to have little bearing on whether the agreement creates a subsidy, for the agreement permits BIW to use the dock to repair and overhaul ships entirely at its own discretion and for its own profit without any obligation to benefit the state or follow its directives.

Although a public subsidy is involved, certain features of the Portland project set this case apart from any prior Maine case or advisory opinion involving public subsidy of a private enterprise. The project is unique in its potential for extensive, long-term, favorable economic impact; in the detailed arrangements under which a large private industry has been committed to long-term obligations in support of a major industrial development; and in the expert testimony at trial, tending to show that the project will improve commerce and create jobs, generating sufficient tax revenues to repay the state's investment.[24] In short, the present case is without comparable Maine precedent.

The plaintiffs assert, however, that the projected arrangements clearly fail to meet the public-purpose test under the rationale of prior decisions of this Court and opinions of its justices. Citing those cases and opin-

---

24. Though plaintiffs have adduced expert testimony that tends to throw doubt on the soundness of the state's economic predictions, doubt about the efficacy of the means used to achieve the underlying purpose will not alone suffice as a basis for holding that the purpose is itself nonpublic.

ions, plaintiffs ask us to hold that the doctrine of public purpose must be applied to bar any direct public subsidy of a private business activity unless it benefits the public directly (*e.g.*, "slum clearance") or has as its ultimate product something that members of the public will have a right to use (*e.g.*, rail transportation). Since repair and overhaul of ships does not directly benefit the public, and since members of the public will have no right to use the shipyard during the term of the agreement, plaintiffs say that the subsidy *cannot* meet the public-purpose test. The project cannot be saved, they argue, by a legislative determination that it will benefit the people of Maine by reviving the commerce of Portland, enhancing opportunities for employment, and improving the economy of the state. To examine their assertion, we must trace the development of the public-purpose doctrine in Maine.

In *Opinion of the Justices,* 58 Me. 590 (1871), the eight justices of the Supreme Judicial Court were asked whether the Legislature has "authority under the constitution to pass laws enabling towns, by gifts of money or loans of bonds, to assist individuals or corporations to establish or carry on manufacturing of various kinds, within or without the limits of said towns." Four of the justices answered categorically in the negative. The other four answered more cautiously, saying, in effect, that *if* the gifts or loans were to aid purely private enterprises unconnected with a public use or public exigencies and without regard to any public advantage, their answer would be in the negative. None of the justices said that aid to ordinary manufacturing enterprises would be for a public purpose, but three reserved judgment on whether, in appropriate circumstances, the use of public money in aid of private industry might possibly be for a public purpose. In particular, two of the justices expressed the special

difficulty they would have if confronted with executed transactions in a litigated case where the Legislature had made an explicit determination of public need for the legislation.[25]

A year later, the opposition of the justices to municipal spending to attract manufacturing establishments was expressed in a litigated case. In *Allen v. Inhabitants of Jay,* 60 Me. 124 (1872), the Court invalidated special legislation authorizing the town of Jay to lend money to a private firm to encourage the firm to move its saw mill and box factory from a neighboring Maine town to Jay. The voters of the town had already voted to make the loan. Though the statute recited that it was "for the benefit of the people of the State," the Court held it unconstitutional on the ground that the projected expenditure was not for a public purpose. In addressing the question, the Court treated the Legislature's power of taxation[26] as if it were qualified by the constitutional limitations on the state's power of eminent domain[27]—even though eminent domain was in no way involved in the case. Except for remarking that taxation and eminent domain have similar effects in depriving an unwilling citizen of property against his will, the opinion made no attempt to justify the limitation the Court was implicitly imposing on the scope of the legislative-powers clause. In terms, that clause gives the Legislature "full power" to make "reasonable" tax laws "for the benefit of the people."

The Court ruled that the town's loan was not for a public use or justified by public exigency. *Id.* at 134–37. Applying the criteria of eminent domain, the Court said that, in the circumstances, unwilling taxpayers in Jay did not receive "just compensation" for the taxes extracted from them to provide the loan.

**25.** For a summary of the rationale of the opinions, see Beck, *The 1965 Maine Municipal Industrial and Recreational Obligations Act,* 18 Me.L.Rev. 25, 27–28 (1966).

**26.** Me. Const. art. IV, pt. 3, § 1, set forth *supra* note 17.

**27.** Me. Const. art. I, § 21, set forth *supra* note 18.

*Allen's* implicit requirement that taxation meet the public-use requirement of eminent domain has been implicitly overruled by later cases and opinions in which the Court has recognized that the Legislature's taxing and taking powers are different and that the requirement of public purpose in taxation may be applied more liberally than the requirement of public use in eminent domain. *E.g., Crommett v. City of Portland,* 150 Me. at 230, 107 A.2d at 849; *Opinion of the Justices,* 118 Me. 503, 513–14, 106 A. 865, 871–72 (1919). But the requirement implied by *Allen* that the activity of the subsidized business give rise to a "public use" has persisted in the language of Maine opinions until recent times. *See Opinion of the Justices,* 152 Me. 440, 445, 131 A.2d 904, 906 (1957).

In few litigated cases since *Allen* has the Law Court had to decide whether a particular tax or spending statute met the public-purpose requirement. Indeed, despite much dictum and some opinions of the justices disapproving proposed legislation, the Law Court has never, since *Allen,* held legislation unconstitutional because it provided for taxation or the spending of public money for a nonpublic purpose.[28] In two cases, *Crommett,* 150 Me. 217, 107 A.2d 841, and *Maine State Housing Authority v. Depositors Trust Co.,* 278 A.2d 699 (Me.1971), the legislation at issue provided both for spending public money and for taking private

property by eminent domain. Although the public as a whole did not have a right to use the product of the subsidized activity,[29] the Court upheld the statute on the ground that a direct public benefit could be found in the effect of the project to eliminate urban blight with its attendant threats to public health and safety.[30] Answering the argument that the redevelopment of the cleared area could result in sale or lease of some parts of the area for private purposes, the Court relied on the proposition that the statutory restrictions on redevelopment, by preventing recurrence of blight, would operate to protect and continue the original public benefit effected by the clearance. That some private interests would be benefited by the project did not prevent the basic purpose from being public in nature.

*State v. F.H. Vahlsing, Inc.,* 147 Me. 417, 88 A.2d 144 (1952), represents an even greater attenuation of the requirement of a direct public benefit. In that case, the constitutionality of an excise tax on potatoes was in issue. The Legislature levied the tax to promote research into better methods of producing, shipping and merchandising potatoes and to support the general purpose of merchandising and advertising potatoes. The Court thought it necessary, in order to find a "public purpose", to say,

> What justifies the tax is that the money expended for the promotion of the potato

---

**28.** The closest it ever came to doing so was in *Hamilton v. Portland Pier Site District,* 120 Me. 15, 112 A. 836 (1921). A taxpayers' suit attacked the constitutionality of legislation authorizing issuance of state obligation bonds to finance the building of wharf facilities in Portland, with power in the pier directors to lease the facilities without limitation as to purpose. The legislation had been enacted pursuant to a constitutional amendment adopted in 1919 providing for state financing "for the purpose of building and maintaining public wharves." The Court upheld the legislation to the extent that it empowered the pier directors to lease "for public purposes." It would violate the public-purpose limitation on the state's power of taxation, the Court said, to authorize leasing for a private purpose. Although the Court cited *Allen v. Inhabitants of Jay* for that proposition, it did not reiterate the *Allen* requirement that the public purpose be the equivalent of the

public use requisite for eminent domain. Also, the result in *Hamilton* could have been reached by reference to the 1919 constitutional amendment itself which was in terms limited to "public wharves."

**29.** The availability of railroads for public transportation had led the Court to uphold both public spending and eminent domain for the benefit of railroads. *Ulmer v. Lime Rock R.R.,* 98 Me. 579, 57 A. 1001 (1904); *Farnsworth v. Lime Rock R.R.,* 83 Me. 440, 22 A. 373 (1891); *Dyar v. Farmington Village Corporation,* 70 Me. 515, 528 (1878) (dictum).

**30.** Professor Beck notes: "Actually what the court seems to have done was to import from a third 'public purpose' area—the exercise of the state's police power—to find a basis for sustaining the act under 'public use.'" Beck, *supra* note 25, at 32.

industry is not primarily expended for the benefit of those individuals engaged therein but for the benefit of the people as a whole by making available to any and all who may wish to enter into the industry the specialized knowledge and information that will enable them to carry the same on, and prospects of a market for that which they produce.[31]

Reflecting some discomfort with so vulnerable a rationale, the Court continued:

The line of demarcation between the expenditure of public funds for the benefit of the individual in order to get an indirect resultant benefit to the people as a whole, and the expenditure of public funds for the benefit of the people as a whole with incidental benefits accruing to individuals may be extremely delicate and hard to discover. To formulate a general rule to cover all situations is neither possible nor do we attempt to do so.[32]

Thus, while giving lip service to *Allen*'s strict public-use requirement for taxation and spending, the Court has, in fact, upheld public assistance to projects that probably would not have met that test in the 1870's. Most of the cases cited by the plaintiffs as applying the public-purpose test are eminent domain cases in which the issue was the constitutional power of the state to authorize the taking of private property.[33] But this Court has long since abandoned the position in *Allen* that the Legislature's power to tax is subject to the restraints of the takings clause. Hence, eminent domain cases, which in effect construe and apply the "public use" language of that clause, are not controlling here. The basic legislation in the present case does not authorize the use of eminent domain, and precedents requiring a strict showing of public use as a basis for taking by eminent domain have little persuasive force. We intimate no opinion about the result in the present case if exercise of the power of eminent domain were at issue.

■ We do not abandon the longstanding requirement that taxation and spending be for a public purpose. It is well settled that a public purpose is the hallmark of legislation that is "for the benefit of the people" within the meaning of the legislative-powers clause. The opinion in *Allen* was wrong, however, in equating the requirement of public purpose in taxation with that of public use in eminent domain. Our later cases implicitly repudiating that notion are correct. Our inquiry into whether the Portland project is for a public purpose must proceed unencumbered by any need to determine whether the assisted project would meet the requisites for authorization of eminent domain.

The question remains, however, whether the Legislature has exceeded its power to tax and spend by subsidizing an activity that does not confer some form of direct benefit on the public. In other words, may an indirect benefit to the economy of the state ever constitute a public purpose to validate a subsidy to private enterprise?

The chief indirect benefit predicted for the Portland project will consist of the jobs provided by the project itself and the economic "ripple effect" of introducing new business into the state. No Maine case has held as yet that public spending to stimulate the economy or create jobs has a public purpose. *Allen v. Inhabitants of Jay* decided that the "possible, contingent and indirect benefit resulting from a manufactur-

---

**31.** *F.H. Vahlsing, Inc.,* 147 Me. at 430, 88 A.2d at 150.

**32.** *Id.*

**33.** Cases like *Brewer Brick Co. v. Inhabitants of Brewer,* 62 Me. 62 (1873), invalidating legislation to permit municipalities to grant tax advantages, stand on a different footing since they implicate the equal-taxation requirements of article IX, section 8, of the Maine Constitution. *See also Farnsworth Co. v. Inhabitants of Lisbon,* 62 Me. 451 (1873); *Opinion of the Justices,* 159 Me. 420, 191 A.2d 627 (1963). *Cf. Howard D. Johnson Co. v. King,* 351 A.2d 524 (Me.1976) (turnpike authority's lessee's operation of restaurant facilities on limited-access turnpike *held* a public use warranting property tax exemption under Me. Const. art. IX, § 8).

ing business" did not justify a loan to induce relocation by a private enterprise. 60 Me. 124, 137 (1872). *See also Crommett v. City of Portland,* 150 Me. 217, 236, 107 A.2d 841, 852 (1954) (dictum); *Laughlin v. City of Portland,* 111 Me. 486, 491, 90 A. 318, 320 (1914) (dictum). Indeed, justices of this Court have gone so far as to quote with approval the following pronouncement of the Massachusetts Supreme Judicial Court made in 1873: "However certain and great the resulting good to the general public, it does not . . . cease to be incidental. The incidental advantage to the public, or to the State, which results from the promotion of private interests . . . does not justify their aid by the use of public money raised by taxation, or for which taxation may become necessary." *Lowell v. City of Boston,* 111 Mass. 454, 461 (1873), quoted in substance in *Opinion of the Justices,* 118 Me. 503, 511, 106 A. 865, 871 (1919).

Yet, as this Court has consistently recognized, the concept of public purpose is not static. "[W]hat could not be deemed a public use a century ago, may, because of changed economic and industrial conditions, be such today. Laws which were entirely adequate to secure public welfare then may be inadequate to accomplish the same results now." *Laughlin,* 111 Me. at 492, 90 A. at 320. *Accord Maine State Housing Authority v. Depositors Trust Co.,* 278 A.2d 699, 704 (Me.1971); *Crommett,* 150 Me. at 233–34, 107 A.2d at 850–51. This Court has approved public expenditures—and, under the related "public-use" doctrine, exercises of eminent domain—that might not have passed muster in earlier times. *See, e.g., Opinion of the Justices,* 437 A.2d 597 (Me. 1981) (conveyance of submerged lands to private interests); *State v. Stinson Canning Co.,* 161 Me. 320, 211 A.2d 553 (1965) (tax to fund research and advertising for sardine industry); *Crommett* (eminent domain and public spending for slum clearance); *State v. F.H. Vahlsing, Inc.,* 147 Me. 417, 88 A.2d 144 (1952) (tax to fund research and advertising for potato industry); *Laughlin* (municipal coal storage facility); *Ulmer v. Lime Rock R.R.,* 98 Me. 579, 57 A. 1001 (1904)

(eminent domain for spur line railroad). Furthermore, the practical effect of *Stinson Canning, Vahlsing,* and *Ulmer* was to reduce the requirement of direct benefit to insignificance. The benefits to the public of subsidizing research and advertising for the potato and sardine industries were not "direct" in any meaningful sense. Similarly, in *Ulmer,* members of the public received no direct benefit from a railroad spur they could not use. We are not inevitably bound by the century-old doctrine of *Allen* that indirect economic benefits are irrelevant.

In other jurisdictions, it is widely accepted that economic development is a public purpose. *See* Lawrence, *Constitutional Limitations on Governmental Participation in Downtown Development Projects,* 35 Vand.L.Rev. 277, 281–82 (1982). *See, e.g., Wright v. City of Palmer,* 468 P.2d 326 (Alaska 1970); *People ex rel. City of Urbana v. Paley,* 68 Ill.2d 62, 11 Ill.Dec. 307, 368 N.E.2d 915 (1977); *Green v. City of Mt. Pleasant,* 256 Iowa 1184, 131 N.W.2d 5 (1964); *City of Frostburg v. Jenkins,* 215 Md. 9, 136 A.2d 852 (1957); *Poletown Neighborhood Council v. City of Detroit,* 410 Mich. 616, 304 N.W.2d 455 (1981); *City of Pipestone v. Madsen,* 287 Minn. 357, 178 N.W.2d 594 (1970); *McKinney v. City of Greenville,* 262 S.C. 227, 203 S.E.2d 680 (1974). As the Court of Appeals of Kentucky said:

> The consensus of modern legislative and judicial thinking is to broaden the scope of activities which may be classed as involving a public purpose. . . . It reaches perhaps its broadest extent under the view that economic welfare is one of the main concerns of the city, state and federal governments.

*Faulconer v. City of Danville,* 313 Ky. 468, 472, 232 S.W.2d 80, 83 (1950).

It has been inferred from *Allen* that any indirect economic benefit, including job creation, however certain and great, is irrelevant in assessing the validity of public spending. To the modern ear, that notion sounds peculiar; unemployment is now one

of the prime concerns of government.[34] See Note, *Legal Limitations on Public Inducements to Industrial Location,* 59 Colum. L.Rev. 618, 646 (1959).

To be sure, there is some merit in a blanket rule that ignores indirect economic benefits. Such a rule, by focusing on more easily measurable direct benefits such as rental payments or public use, would help ensure that the public gets its money's worth for its investment. Moreover, the rule helps avoid the risk of approving transactions sponsored by legislators who may have been unduly dominated by the private enterprise. *See* Michelman, *Political Markets and Community Self-Determination: Competing Judicial Models of Local Government Legitimacy,* 53 Ind.L.J. 145, 163 (1977–1978).

■ But these concerns can be met without the drastic remedy of ignoring all indirect economic benefits. Ultimately, in examining the constitutionality of a tax or spending measure, the Court should focus on whether "the plan threatens a detriment to the public which outweighs the benefit that could have been anticipated." Note, *supra,* 59 Colum.L.Rev. at 647.[35] In such a weighing, both direct and indirect benefits are relevant. Accordingly, we now hold that indirect economic benefits may be taken into consideration in deciding whether public spending by the state is justified.

■ Although the public-purpose inquiry turns on whether the likely costs of the Portland project outweigh the likely benefits, the scope of judicial review is narrow. The courts must treat such legislation as constitutional unless it is clearly demonstrated to be otherwise. *Crommett,* 150 Me. at 232, 107 A.2d at 850; *Laughlin,* 111 Me. at 489, 90 A. at 319.[36] The weighing of costs and benefits is for the Legislature in the first instance, and this Court should invalidate expenditures only when the Legislature's decision has no rational basis. *See* Note, *Incentives to Industrial Relocation: The Municipal Industrial Bond Plans,* 66 Harv.L.Rev. 898, 903 (1953).

■ Though plaintiffs have pointed out aspects of the project that raise specific doubts about its ultimate effectiveness, they have not convinced us that the arrangements for this unique project at Portland are clearly unreasonable as a means for achieving the stated purposes. The rationality of the Legislature's and voters' decision is supported by the following facts:

---

**34.** *See* 26 M.R.S.A. § 1042 (1974), which provides, in part, as follows:

Economic insecurity due to unemployment is a serious menace to the health, morals and welfare of the people of this State. Unemployment is therefore a subject of general interest and concern which requires appropriate action by the Legislature to prevent its spread and to lighten its burden which may fall upon the unemployed worker, his family and the entire community.

*See also Carmichael v. Southern Coal & Coke Co.,* 301 U.S. 495, 515–17, 57 S.Ct. 868, 875–876, 81 L.Ed. 1245, 1256–57 (1937).

**35.** Under this reasoning, we need not overrule the result in *Allen* on its facts, and we should not be understood to do so.

**36.** The following passage elaborates the presumption of constitutionality that must control our resolution of this case:

It [a court] can only disregard the Act when those who have the right to make laws have not merely made a mistake, but have made a very clear one,—so clear that it is not open to rational question. That is the standard of duty to which the courts bring legislative Acts; that is the test which they apply,—not merely their own judgment as to constitutionality, but their conclusion as to what judgment is permissible to another department which the constitution has charged with the duty of making it. This rule recognizes that, having regard to the great, complex, ever-unfolding exigencies of government, much which will seem unconstitutional to one man, or body of men, may reasonably not seem so to another; that the constitution often admits of different interpretations; that there is often a range of choice and judgment; that in such cases the constitution does not impose upon the legislature any one specific opinion, but leaves open this range of choice; and that whatever choice is rational is constitutional. This is the principle which the rule that I have been illustrating affirms and supports.

Thayer, *The Origin and Scope of the American Doctrine of Constitutional Law,* 7 Harv.L.Rev. 129, 143–44 (1893).

that Bath Iron Works is a large concern with strong ties to Maine and with long experience in the type of operation that it will be conducting in Portland; that operations of the type projected require many employees; and that the project is supported by expert testimony to the effect that the availability of facilities for ship repair will make Portland more attractive to seaborne commerce. Moreover, Bath Iron Works itself is contractually bound to invest several million dollars in the Portland project. That substantial private investment serves as an added measure of assurance of the soundness of the project, distinguishing this case from an outright donation, which would permit a private enterprise to take a risk-free, speculative gamble at public expense.[37]

The Legislature's adoption of the arrangements is not rendered irrational simply because BIW has not agreed to create any certain number of jobs, or to service all ships in need of repair, or to subject its operations in Portland to more state control than the agreement provides. The Legislature could reasonably decide that, in the circumstances, the agreement sufficiently serves the public interest without additional restrictions on BIW.

Whether this Court would have made the same choice as the Legislature is irrelevant. After carefully considering all the facts of record in this case, we cannot say that the legislative choice was irrational.

## IV. DUE PROCESS

■ The plaintiffs contend that the Portland project constitutes a taking of property without due process, in violation of the fourteenth amendment of the United States Constitution. We consider this contention on the premise that the project has a public purpose; otherwise, it would be unnecessary to reach the due process question.

In *Citizen Savings Bank & Loan Association v. City of Topeka,* 87 U.S. (20 Wall.) 655, 22 L.Ed. 463 (1874), the city of Topeka issued bonds as a donation to encourage a company to expand in the city. In an opinion that did not link the public-purpose doctrine to any particular provision of the United States Constitution, the Supreme Court struck down the arrangement as not being for a public purpose. A later case incorporated the doctrine into the fourteenth amendment. *Jones v. City of Portland,* 245 U.S. 217, 38 S.Ct. 112, 62 L.Ed. 252 (1917), *aff'g* 113 Me. 123, 93 A. 41 (1915).

*Topeka* has been substantially undermined by later Supreme Court decisions making clear that the Court will defer to the states in the area of taxation so as to permit local economic experimentation. *Carmichael v. Southern Coal Co.,* 301 U.S. 495, 57 S.Ct. 868, 81 L.Ed. 1245 (1937); *Green v. Frazier,* 253 U.S. 233, 40 S.Ct. 499, 64 L.Ed. 878 (1920); *Jones,* 245 U.S. 217, 38 S.Ct. 112, 62 L.Ed. 252. *See* Pinsky, *State Constitutional Limitations on Public Industrial Financing: An Historical and Economic Approach,* 111 U.Pa.L.Rev. 265, 282 (1963). Thus, in *Jones,* the Supreme Court upheld a finding of public purpose by this Court, reasoning as follows:

> [W]hile the ultimate authority to determine the validity of legislation under the Fourteenth Amendment is rested in this court, local conditions are of such varying character that what is or is not a public use in a particular state is manifestly a matter respecting which local authority, legislative and judicial, has peculiar facilities for securing accurate information.

245 U.S. at 221, 38 S.Ct. at 113. Finally, in *Albritton v. City of Winona,* 303 U.S. 627, 58 S.Ct. 706, 82 L.Ed. 1088 (1938), where the Supreme Court of Mississippi had upheld

---

**37.** On the other hand, risks cannot be entirely eliminated from public spending. As the Supreme Court of Alaska noted in upholding public borrowing for industrial development: "Long-run economic and social changes are ever present sources of financial risk. Popula-

tion shifts or widespread economic recession may render unworkable fiscal policies that were once considered sound. These risks, however, are inevitable concomitants of public decision making." *Wright v. City of Palmer,* 486 P.2d at 330 n. 11.

the validity of a statute authorizing the use of municipal funds to finance the construction of facilities for a private corporation, the Court dismissed the appeal "for want of a substantial federal question." The plaintiffs' due-process argument is without merit.

## V. LOAN OF THE STATE'S CREDIT

■ The plaintiffs contend that the state's agreements with BIW violate article IX, section 14 of the Maine Constitution because the agreements effect a loan of the state's credit to BIW. Article IX, section 14 provides in pertinent part:

> The credit of the State shall not be directly or indirectly loaned in any case, except as provided in Sections 14–A, 14–C, 14–D and 14–E. The Legislature shall not create any debt or debts, liability or liabilities, on behalf of the State, which shall singly, or in the aggregate, with previous debts and liabilities hereafter incurred at any one time, exceed two million dollars, except to suppress insurrection, to repel invasion, or for the purposes of war, and except for temporary loans to be paid out of money raised by taxation during the fiscal year in which they are made; and excepting also that whenever two-thirds of both Houses shall deem it necessary, by proper enactment ratified by a majority of the electors voting thereon at a general or special election, the Legislature may authorize the issuance of bonds on behalf of the State at such times and in such amounts and for such purposes as approved by such action
> . . . .

(emphasis added). We agree with the Superior Court that the agreements do not run afoul of the credit clause in article IX, section 14, because that clause was intended only to proscribe suretyship or loan guarantee arrangements, not to affect the ability of the state itself to contract debt.

The defendants make no claim that the state's borrowing falls within sections 14–A, 14–C, 14–D, or 14–E of article IX, the listed exceptions to the credit clause. Under the proposed bond issue, the state will incur debt in its own name, rather than as surety or guarantor for BIW. Thus this case raises the question, as yet unresolved in Maine, whether the state violates the credit clause when it borrows in its own name and uses the borrowed funds in a project that benefits a private corporation as well as the public.

We do not adopt the view of the defendants and some courts, *see, e.g., Dyche v. City of London,* 288 S.W.2d 648 (Ky.1956), that by definition, borrowing for a public purpose cannot constitute lending the state's credit. Such an approach, by collapsing the loan-of-credit question into one of public purpose, would read the credit clause out of the Maine Constitution. *See* Note, *Legal Limitations on Public Inducements to Industrial Location,* 59 Colum.L. Rev. 618, 634 (1959); Comment, *State Constitutional Provisions Prohibiting the Loaning of Credit to Private Enterprise—A Suggested Analysis,* 41 U.Colo.L.Rev. 135, 138–39 (1969). *But see* Note, *"Public Purpose" of Municipal Financing for Industrial Development,* 70 Yale L.J. 789, 794 n. 30 (1961).

The high courts of other states are divided on whether credit-lending prohibitions apply to borrowing by the state as primary debtor. Some courts have explicitly limited such prohibitions to the state in the role of surety, *Wilmington Medical Center v. Bradford,* 382 A.2d 1338 (Del.1978) (alternative holding); *Richards v. City of Muscatine,* 237 N.W.2d 48 (Iowa 1975); *Development Credit Corp. v. McKean,* 248 Md. 572, 237 A.2d 742 (1968) (dictum); *State ex rel. Jardon v. Industrial Development Authority,* 570 S.W.2d 666 (Mo.1978) (alternative holding); *Tosto v. Pennsylvania Nursing Home Loan Agency,* 460 Pa. 1, 331 A.2d 198 (1975); *State ex rel. Thomson v. Giessel,* 271 Wis. 15, 72 N.W.2d 577 (1955), while other courts, by implication, have rejected such an interpretation. *Village of Moyie Springs v. Aurora Manufacturing Co.,* 82 Idaho 337, 353 P.2d 767 (1960); *State ex rel. Beck v. City of York,* 164 Neb. 223, 82 N.W.2d 269

(1957); *State ex rel. Saxbe v. Brand,* 176 Ohio St. 44, 197 N.E.2d 328 (1964); *Port of Longview v. Taxpayers of Longview,* 84 Wash.2d 475, 527 P.2d 263 (1974), *modified,* 85 Wash.2d 216, 533 P.2d 128 (1975). The approach of the former cases is more faithful to the historical basis of credit-lending prohibitions and the development of Maine's own debt limitations than is the interpretation advanced by the plaintiffs.

During the freewheeling era of the 1830's and 1840's, railroads and canals underwent rapid expansion. Private investment capital was often inadequate, and many states borrowed money to fill the breach, using the public credit. A series of failures of those speculative ventures led to adoption in most states of constitutional limitations on state borrowing, including prohibitions against "loans of state credit." *See* Pinsky, *State Constitutional Limitations on Public Industrial Financing: An Historical and Economic Approach,* 111 U.Pa.L.Rev. 265, 277–81 (1963). *See generally* A. Heins, *Constitutional Restrictions Against State Debt* (1963). Such loans, typically in the form of public guaranty of railroad bonds, Pinsky, *supra,* at 278, were used by state and local governments to evade constitutional limits on straightforward public borrowing.

Surety debt proved to be seductive and dangerous. As the Supreme Court of Iowa said:

> The liability of the surety is always secondary and not primary. It is a liability for the debt of another, which the other is bound to pay. And herein is the delusion of suretyship. The surety assumes a secondary liability in the optimistic assurance and belief always that the primary debtor will pay, and that he will never be required to perform the obligation . . . . Pursuant to these secondary liabilities, the state became overwhelmed with millions of dollars of indebtedness which never would have been undertaken as primary indebtedness . . . . It was to remove this delusion of suretyship with its snare of temptation that [Iowa's credit clause] was adopted. . . .

*Grout v. Kendall,* 195 Iowa 467, 473, 192 N.W. 529, 531 (1923).[38]

The particular evils sought to be avoided by credit clauses of state constitutions are not present here. This is not an attempt to circumvent the limitations on the amount of direct state debt; the borrowing was submitted for legislative and voter approval squarely within the requirements of article IX, section 14, the provision that contains the state debt ceiling. The bonds involve none of the seductive lure of suretyship; from the inception of the project, it has been fully recognized that the bonds will be the direct obligations of the state.

In sum, the term "credit" in the typical credit clause has a historical basis as a term of art referring "to a surety relationship between the public body and . . . business primarily liable on the incurred debt." *Bradford,* 382 A.2d at 1346. *See also Tosto,* 460 Pa. at 15–16, 331 A.2d at 205; *State ex rel. Wisconsin Development Authority v. Dammann,* 228 Wis. 147, 280 N.W. 698 (1938). It did "not purport to deal with the creation of a primary indebtedness for any purpose whatever. That question was left to be dealt with in other sections." *Grout,* 195 Iowa at 473, 192 N.W. at 531.

The development and structure of Maine's credit clause are consistent with reading "credit" as a term of art, limited to suretyship. The clause appeared in 1848 as part of an article amending the state constitution to establish an absolute ban on loans of credit and place a ceiling on direct state indebtedness.[39] In later years exceptions

---

**38.** Iowa's credit clause, contained in Iowa Const. art. 7, § 1, stated in relevant part: "The credit of the state shall not, in any manner, be given or loaned to, or in aid of, any individual, association, or corporation . . . ."

**39.** The full text read:

> The credit of the state shall not be directly or indirectly loaned in any case. The legislature shall not create any debt or debts, liability or liabilities, in behalf of the state, which shall singly, or in the aggregate, with previ-

were created empowering the state to incur debt as surety. Thus, the state may now issue bonds to insure mortgage loans for industrial, manufacturing, fishing, agricultural and recreational enterprises, art. IX, § 14–A (Supp.1982); for Indian housing, art. IX, § 14–D (Supp.1982); for Maine veterans, art. IX, § 14–E (Supp.1982); and to insure payment of revenue bonds of the Maine School Building Authority, art. IX, § 14–C (Supp.1982). Each provision is cast as an exception to the credit-lending prohibition rather than the direct state-debt clause.

The Maine precedents plaintiffs rely on are not on point. *Opinion of the Justices,* 53 Me. 587 (1867), dealt merely with whether the state's assumption of municipal war debts would create debt in excess of the constitutional debt ceiling outside the scope of debt-ceiling exceptions. In *Opinion of the Justices,* 146 Me. 183, 79 A.2d 753 (1951), the issue was only whether a state obligation to make lease payments to amortize bonds used to finance the state office building created debt in excess of the debt ceiling.

The plaintiffs argue that article IX, section 14–A of the Maine Constitution is the exclusive route for state funding of economic development projects. That section authorizes the Legislature to insure payment of mortgage loans on real estate and personal property of industrial, manufacturing, fishing, agricultural and recreational enterprises, and to issue bonds on behalf of the state for that purpose.[40] The argument is unpersuasive. Neither the text of section 14–A nor the legislative debates preceding its original adoption in 1957 contain the slightest hint that the section, by authorizing limited surety debt, was intended to foreclose otherwise permissible direct state debt. *See* 2 Legis.Rec. 1963–64, 2312–15, 2335–38, 2509–14 (1957).

The proposed bond issue for the Portland project does not constitute a loan of state credit under article IX, section 14.

None of the other issues raised by the parties on this appeal requires discussion.

The entry is:

Judgment affirmed.

All concurring.

---

ous debts and liabilities hereafter incurred at any one time, exceed three hundred thousand dollars, except to suppress insurrection, to repel invasion, or for purposes of war; but this amendment shall not be construed to refer to any money that has been, or that may be deposited with this state by the government of the United States, or to any fund which the state shall hold in trust for any Indian Tribe.
Const. Res. 1847, ch. 29.
Through the years, the constitutional debt ceiling was raised to higher levels, Const. Res. 1919, ch. 155; Const. Res. 1933, ch. 222, and exceptions to the debt limit were created, Const. Res. 1912, ch. 1; Const. Res. 1919, chs. 110, 168 & 173.
In 1949, article IX, § 14 was amended to permit bond issues in excess of the absolute debt limit (then at $2 million) for specified purposes when approved by a two-thirds vote of each legislative house and ratified by the majority of the electorate in a referendum. Const. Res. 1949, ch. 99. Two years later, section 14 was again amended to empower the legislature and electorate to approve bonds, without dollar limit, for any purpose. Const. Res. 1951, ch. 179.

**40.** Me. Const. article IX, § 14–A (Supp.1982) provides as follows:

For the purposes of fostering, encouraging and assisting the physical location, settlement and resettlement of industrial, manufacturing, fishing, agricultural and recreational enterprises within the State, the Legislature by proper enactment may insure the payment of mortgage loans on real estate and personal property within the State of such industrial, manufacturing, fishing, agricultural and recreational enterprises not exceeding in the aggregate $90,000,000 in amount at any one time and may also appropriate moneys and authorize the issuance of bonds on behalf of the State at such times and in such amounts as it may determine to make payments insured as aforesaid. For the purposes of this section, a documented fishing vessel or a vessel registered under state law shall be construed as real estate.